# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHONY MARIO WATSON, | Civil No. 01cv1780-AJB |
| Petitioner, | **ORDER:** |
| vs. | **(1) GRANTING IN PART AND DENYING IN PART REQUEST TO AMEND THE PETITION;** |
| MATTHEW CATE, Secretary,[1] | **(2) DENYING PETITION FOR WRIT OF HABEAS CORPUS; AND** |
| Respondent. | **(3) ISSUING A CERTIFICATE OF APPEALABILITY** |

## I.      Introduction

Petitioner is a California prisoner serving a sentence of 40 years-to-life in state prison following convictions in the San Diego County Superior Court for murder, kidnaping, assault with a firearm, and false imprisonment.  On September 27, 2001, Petitioner constructively filed a pro se Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 presenting four claims: (1) insufficient evidence to support the convictions; (2) ineffective assistance of trial counsel for failing to investigate and interview potential alibi witnesses; (3) prosecutorial misconduct in using false evidence to establish a motive; and (4) ineffective assistance of

---

[1] The Court substitutes Matthew Cate, the Secretary of the California Department of Corrections and Rehabilitation, as Respondent in place of his predecessor and former Respondent Teresa Rocha.

1  appellate counsel for failing to raise the prosecutorial misconduct claim on appeal.[2]  (Pet. [Doc.

2  No. 1] at 6-9.)  The Court ordered expansion of the record (Doc. Nos. 42, 47), appointed counsel

3  to represent Petitioner (Doc. No. 52), and held an evidentiary hearing limited to the alibi aspect

4  of the ineffective assistance of trial counsel claim.  (Doc. Nos. 82-83.)  In a post-evidentiary

5  hearing brief, Petitioner's appointed federal habeas counsel identified numerous additional

6  allegations of deficient performance of trial counsel, including two additional alibi witnesses

7  who were not contacted by trial counsel, and requested, in a footnote, actual or constructive

8  amendment of the Petition to include an ineffective assistance of counsel claim predicated on

9  the individual and cumulative effect of trial counsel's errors.  (Doc. No. 84 at 17 n.21.)  On

10  November 17, 2004, judgment was entered denying habeas relief on the merits of the claims in

11  the Petition and Traverse, but without addressing the new allegations of deficient performance

12  or the request to amend the Petition.  (Doc. No. 93.)

13      On September 13, 2006, the Ninth Circuit affirmed in part, reversed in part, dismissed in

14  part, and remanded.  (Doc. No. 109.)  The Court affirmed the denial of habeas relief in all

15  respects with the exception of that aspect of the ineffective assistance of trial counsel claim

16  which relied on the two new potential alibi witnesses, and remanded with instructions to hold

17  another evidentiary hearing and to make specific findings with respect to trial counsel's reason

18  for not contacting those two individuals.  (Id. at 2-6.)  With respect to the new ineffective

19  assistance claim predicated on allegations which were not presented to the state courts, the Ninth

20  Circuit found that is was "barred from considering the merits" of the claim, and dismissed the

21  appeal "without prejudice to the extent it raises this unexhausted claim."  (Id. at 6-7.)

22      On February 27, 2009, the Court granted Petitioner's stay and abeyance motion, *nunc pro*

23  *tunc* to January 28, 2008, the date it was filed.  Petitioner, through his appointed federal habeas

24  counsel, returned to state court to exhaust three claims:  (1) a claim alleging a sentencing issue;

25  (2) a claim alleging "it appears highly likely" that the prosecution failed to disclose forensic

_____

27  [2] Petitioner raised two additional claims in the Traverse, both of which have been treated by the
Court as if they were raised in the Petition:  (1) ineffective assistance of counsel for failing to cross-
28  examine a prosecution witness regarding an alleged immunity agreement; and (2) prosecutorial
misconduct in failing to disclose the alleged immunity agreement.  (See 11/17/04 Order Denying
Petition [Doc. No. 93] at 30, 32, citing Traverse at 5, 7, 11.)

evidence and evidence regarding kidnap victim Williams' injuries in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963); and (3) an ineffective assistance of trial counsel claim relying on the individual and cumulative effect of the numerous new allegations of deficient performance.  (Doc. No. 118.)  Petitioner states that he intentionally excluded the alibi aspect of the ineffective assistance of trial counsel claim in the state court exhaustion petition, as well as any reference to the two new alibi witnesses.  (Doc. No. 152 at 4.)  However, as part of the cumulative ineffective assistance claim raised in the exhaustion petition, Petitioner alleged that trial counsel lied at the federal evidentiary hearing regarding what he knew about the two new alibi witnesses and when he knew it.  (Pet.'s Ex. vol. VI [Doc. No. 132] at 2018-19.)

The state trial court denied the ineffective assistance of counsel claim and the <u>Brady</u> claim on their merits, and also found that the new allegations of deficient performance were evident from the trial transcript and should have been raised on appeal.  (Pet.'s Ex. vol. V [Doc. No. 131] at 1764-71.)  The appellate court summarily denied the new <u>Brady</u> claim and the new ineffective assistance claim, but granted relief on the sentencing claim and reduced Petitioner's sentence from 55 years-to-life to 40 years-to-life.  (Resp.'s Lodgment K; Pet.'s Ex. vol. VI at 2096-2106.)  Exhaustion was completed as to the ineffective assistance and <u>Brady</u> claims on October 14, 2009, when the state supreme court denied the exhaustion petition with an order which stated: "The petition for writ of habeas corpus is denied.  (See *In re Robbins* (1998) 18 Cal.4th 770, 780; *In re Clark* (1993) 5 Cal.4th 750.)"  (Pet.'s P&A Ex. vol. VI at 2095.)  Review ended with respect to the sentencing claim on May 12, 2010.  (<u>Id.</u> at 2110.)

On July 2, 2010, Petitioner filed a Memorandum of Points and Authorities with Respect to Now Exhausted Issues ("Pet.'s P&A") in which he seeks to present the newly exhausted ineffective assistance of trial counsel claim and the newly exhausted <u>Brady</u> claim.  (Doc. No. 123 at 7, 26.)  Petitioner requests that the Court order Respondent to respond to his new claims, and to hold an evidentiary hearing and permit discovery regarding whether <u>Brady</u> material was withheld.  (<u>Id.</u> at 67-68.)  Although Petitioner has not actually filed an amended Petition, he has submitted several volumes of "Documents in Support of Amended Petition," and requests the Court to recognize the original Petition as having been constructively amended to include the

newly exhausted claims.  (Id. at 26; Doc. Nos. 124-33.)   The case was transferred to the undersigned Judge on March 14, 2011, and Respondent was thereafter directed to respond to Petitioner's Memorandum.  (Doc. Nos. 134-35.)

On June 10, 2011, Respondent filed an Opposition ("Resp.'s Opp."), characterizing Petitioner's Memorandum as a motion to amend the Petition, and arguing that leave to amend should be denied as futile since the claims are procedurally defaulted by virtue of the state court's imposition of procedural bars against untimely and successive petitions. (Doc. No. 138.) Respondent also argues that the one-year statute of limitations has expired on the new claims because Petitioner waited over a year after discovering them before requesting amendment of the Petition, and because they do not relate back to the original, timely Petition.  Respondent also argues that the intervening opinion in Cullen v. Pinholster, 563 U.S. ___, 131 S.Ct. 1388 (2011) (holding that a federal habeas court may only consider evidence presented in the state court in determining whether a petitioner has satisfied 28 U.S.C. § 2254(d)(1)), precludes another evidentiary hearing despite the Ninth Circuit's directions on remand.

Petitioner has filed a Reply ("Pet.'s Reply") in which he agrees that Pinholster, which was announced after he filed his Memorandum, precludes another evidentiary hearing, and further argues that Pinholster precludes this Court from considering the evidence already developed at the federal evidentiary hearing.  (Doc. No. 152 at 10-13.)  He contends, however, that the law of the case doctrine requires issuance of the writ because United States District Judge Roger Benitez, who presided over the evidentiary hearing and entered the original order denying habeas relief, has already found that habeas relief is appropriate based on the evidence that was before the Court prior to the evidentiary hearing.  (Id. at 7-9, 13-17.)  Petitioner also contends his original Petition has already been amended to include the new claims.  (Id. at 20-21, 38-40.) With respect to the one-year statute of limitations, Petitioner contends that he only discovered the more serious new allegations of deficient performance when he reviewed trial counsel's file in late 2003 in preparation for the March 2004 federal evidentiary hearing.  (Id. at 20.)  He argues that there has been no delay in presenting the new Brady claim to the state courts because he is still not sure of the factual basis for that claim, and requests discovery to determine whether

1   evidence was withheld.  (Id. at 36-37.)  Finally, Petitioner contends that equitable considerations

2   weigh against finding a procedural default, that California's timeliness bar is not independent

3   of federal law nor adequate to support the state court judgment, and that in any case he can

4   establish cause, prejudice, and the existence of a fundamental miscarriage of justice sufficient

5   to excuse any default.  (Id. at 17-36.)

6          For the following reasons, the Court recognizes that the Petition has been constructively

7   amended to include the newly exhausted claims as of the date the Court granted Petitioner's stay

8   and abeyance motion, but not at an earlier date as argued by Petitioner.  However, even

9   assuming an earlier date of amendment, the vast majority of the newly exhausted claims have

10  not been presented to this Court within the one-year statute of limitations.  Furthermore, even

11  if Petitioner could establish that the newly exhausted claims are timely, they are procedurally

12  defaulted and lacking in merit.  The Court finds that Pinholster precludes the Court from

13  conducting another evidentiary hearing irrespective of the Ninth Circuit's instructions on

14  remand, or from considering the evidence adduced at the evidentiary hearing previously held.

15  Rather, Pinholster requires the Court to reexamine the previous denial of habeas relief as to the

16  sole remaining claim presented in this action, which alleges ineffective assistance of counsel for

17  failure to investigate and interview potential alibi witnesses, and to review that claim based

18  solely on the state court record under the standard announced in the intervening decision in

19  Harrington v. Richter, 562 U.S. ___, 131 S.Ct. 770, 786 (2011) (holding that when reviewing

20  a summary denial of an ineffective assistance of counsel claim under 28 U.S.C. § 2254(d), "a

21  habeas court must determine what arguments or theories . . . could have supported the state

22  court's decision; and then it must ask whether it is possible fairminded jurists could disagree that

23  those arguments or theories are inconsistent with the holding in a prior decision of this Court.")

24  The Court rejects Petitioner's contention that Judge Benitez has already ruled that habeas relief

25  is appropriate or available based on the state court record.  The Court reaffirms without

26  reexamination the previous denial of the other claims in the Petition and Traverse, which were

27  denied on the basis of the state court record and affirmed by the Ninth Circuit.  Finally, the Court

28  issues a Certificate of Appealability with respect to all claims and issues encompassed in this

1    action.

2    **II.    Amendment of the Petition**

3           Respondent argues that the Petition has never been amended to include the newly

4    exhausted claims, and opposes amendment as futile since the new claims are untimely and

5    procedurally defaulted.  (Resp.'s Opp. at 7-16.)  Petitioner replies that the Ninth Circuit

6    constructively amended the Petition to include the new claims, and the Petition was amended

7    at the latest when the stay and abeyance motion was granted.  (Pet.'s Reply at 38-40.)

8           **A.    Legal Standard**

9           Federal Rule of Civil Procedure 15(a) provides that, other than when amendment is

10   available as of right, which does not apply here, "a party may amend its pleading only with the

11   opposing party's written consent or the court's leave.  The court should freely give leave when

12   justice so requires."  Fed.R.Civ.P. 15(a); see 28 U.S.C. § 2242 (stating that a habeas petition

13   "may be amended or supplemented as provided in the rules of procedure applicable to civil

14   actions.").  A district court should consider factors such as "bad faith, undue delay, prejudice to

15   the opposing party, futility of the amendment, and whether the party has previously amended his

16   pleadings."  Bonin v. Calderon, 59 F.3d 815, 845 (9th Cir. 1995).

17          **B.    Analysis**

18          Respondent contends that Petitioner did not request leave to amend the Petition to include

19   the newly exhausted claims during the year prior to the evidentiary hearing held in March 2004,

20   when they were presumably discovered.  (Resp.'s Opp. at 11-12.)  Respondent also contends that

21   Petitioner knew the factual basis of the new claims well before the Court denied the Petition in

22   November 2004, and well before the Ninth Circuit issued its order in September 2006, but still

23   did not seek leave to amend.  (Id.)

24          Petitioner replies that he requested amendment of the Petition in his June 2004 post-

25   evidentiary hearing brief, and the Ninth Circuit recognized in its order that the Petition had been

26   amended because "it could not dismiss something that was never incorporated in the petition."

27   (Pet.'s Reply at 20-21, 38-40.)  He argues that the Petition was amended at the latest when his

28   stay and abeyance motion was granted, because only a petition containing both exhausted and

1    unexhausted claims could have been held in abeyance while this action was stayed.  (Id.)

2                                    **1.  June 16, 2004**

3             The first request for constructive or actual amendment of the Petition was presented in

4    a footnote in the post-evidentiary hearing memorandum filed by Petitioner's appointed federal

5    defender on June 16, 2004.  (See Doc. No. 84 at 17 n.21; Pet.'s Reply at 20.)  There is no

6    indication in the record why that request was not addressed by the Court, although it certainly

7    would have been proper for the Court to reject the request on the basis that it was contained in

8    a footnote in a brief rather than presented as a separate motion.  See e.g. Marquette v. Belleque,

9    2010 WL 4235889 at *2 (D.Or. 2010) (denying a request to amend habeas petition contained in

10   a footnote of a supporting memorandum drafted by a federal defender appointed to represent a

11   petitioner who had filed a pro se petition, noting that the request violated habeas Rule 2(c), the

12   court's local rules, and defied traditional motions practice), citing Rule 2(c), Rules foll. 28

13   U.S.C. § 2254 (requiring habeas petitions to "specify all the grounds for relief available to the

14   petitioner"), and Greene v. Henry, 302 F.3d 1067, 1070 n.3 (9th Cir. 2002) (holding that a court

15   need not consider claims presented in memorandum filed in the district court but not raised in

16   the petition); see also So. Dist. Ca. Local Rule 15.1 (requiring that an amended pleading

17   "must be retyped and filed so that it is complete in itself without reference to the superceded

18   pleading.")

19            Although Petitioner's footnoted request for amendment was not specifically addressed

20   by the Court prior to entering judgment, it is clear that the Court did not *sub silentio* grant leave

21   to amend as Petitioner contends, because if this Court had permitted amendment of the Petition

22   at that time it would have become a "mixed" petition, that is, one containing both exhausted and

23   unexhausted claims.  See Greene, 302 F.3d at 1070 n.3 (noting that because the claims sought

24   to be included in the petition were not exhausted, "had they been made in the federal habeas

25   petition, they would have made it a mixed petition, and could not have been considered."), citing

26   Rose v. Lundy, 455 U.S. 509, 514, 520-21 (1982) (holding that "a district court must dismiss

27   such 'mixed' petitions, leaving the petitioner with the choice of returning to state court to

28   exhaust his claims or of amending or resubmitting the habeas petition to present only exhausted

claims to the district court.")  There is no indication that this Court treated the Petition as mixed after Petitioner filed his post-evidentiary brief, because the Court did not deny (or even address) the unexhausted claims in its order denying the Petition.  See 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); but see Acosta-Huerta v. Estelle, 7 F.3d 139, 142 (9th Cir. 1992) (holding that a district court can reach the merits of an unexhausted claim under § 2254(b)(2) only when the Court determines it does not present a colorable claim for relief).  Rather, because this Court later granted stay and abeyance as to these claims, which, as discussed below, necessarily required a determination that the claims are not "plainly meritless," it is not possible that this Court sub silentio denied the unexhausted claims under § 2254(b)(2).  Acosta-Huerta, 7 F.3d at 142; see Cassim v. Bowen, 824 F.2d 791, 795 (9th Cir. 1987) ("A claim is colorable if it is not wholly insubstantial, immaterial, or frivolous."); see e.g. Johnson v. Sullivan, 2006 WL 37037 at *2 (C.D. Cal. 2006) (recognizing that the stay and abeyance "plainly meritless" standard is the same as the "colorable claim" standard of Cassett v. Stewart, 406 F.3d 614, 623 (9th Cir. 2005) (holding that "a federal court may deny an unexhausted petition on the merits only when it is perfectly clear that the applicant does not raise even a colorable claim.")).

This conclusion is further supported by the Ninth Circuit's order, which, instead of addressing whether this Court had properly determined that the unexhausted claims were not colorable, stated that it was "barred from considering the merits" of the unexhausted claims. (Doc. No. 109 at 7.)  The Ninth Circuit would likely not have affirmed in part this Court's denial of habeas relief had the Petition been mixed.  See Pliler v. Ford, 542 U.S. 225, 230 (2004) (holding that "federal district courts must dismiss mixed habeas petitions."), citing Rose, 455 U.S. at 514, 520-21; see also Valerio v. Crawford, 306 F.3d 742, 769-70 (9th Cir. 2002) (recognizing rare exception to Rose rule applicable only to appellate courts, and indicating that "the strictness of the prohibition against ruling on claims in mixed petitions is primarily directed at the district courts."), citing Granberry v.Greer, 481 U.S. 129, 131, 134 (1987) (holding that the interests of justice may be better served in "some cases in which it is appropriate for an

appellate court to address the merits of a habeas corpus petition, notwithstanding the lack of complete exhaustion.")  It is clear that the Petition was not mixed at the time this Court denied habeas relief, and the Petition had therefore not been amended at that time.

Petitioner argues that when addressing a claim of ineffective assistance of counsel, as the Court did when ruling on the merits of his Petition, the Supreme Court has indicated that "it is advisable to consider counsel's overall performance."  (Pet.'s Reply at 21, citing Kimmelman v. Morrison, 477 U.S. 365, 386 (1986) ("It will generally be appropriate for a reviewing court to assess counsel's overall performance throughout the case in order to determine whether the 'identified acts or omissions' overcome the presumption that a counsel rendered reasonable professional assistance."), quoting Strickland v. Washington, 466 U.S. 668, 689 (1984) (holding that in order to show constitutionally ineffective assistance of counsel, a petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and that counsel's deficient performance prejudiced the defense by demonstrating a reasonable probability that the result of the proceeding would have been different absent the error.))  Petitioner contends the new allegations of deficient performance were promptly and properly raised, and were highly relevant to the ineffective assistance of trial counsel claim which was then pending, but Respondent did not object after being placed on notice that the new allegations of deficient performance had effectively amended the original ineffective assistance claim.  (Pet.'s Reply at 21.)

Petitioner is correct that Respondent did not at that time object that Petitioner was attempting to raise new, unexhausted claims.  However, there does not appear to have been any reason for Respondent to have done so, as the Court had not ruled on Petitioner's procedurally improper request to amend, did not address the unexhausted claims in its order denying the Petition, and did not recognize the Petition as containing any unexhausted claims.  Petitioner in fact recognized the Petition had not been amended when he argued in his Notice of Appeal that he "seeks to appeal the district court's *sub silentio* denial of his motion to amend, or the failure to rule on that request."  (Doc. No. 97 at 3.)  Furthermore, Kimmelman's direction to consider counsel's overall conduct does not excuse Petitioner's failure to present the new allegations of

1    deficient performance to the state courts.  See e.g. Rhines v. Weber, 544 U.S. 269, 276-77 (2005)

2    (providing a "simple and clear instruction to potential litigants: before you bring any claims to

3    federal court, be sure that you first have taken each one to state court."), quoting Rose, 455 U.S.

4    at 520.[3]

5          It was the procedurally improper manner in which Petitioner requested amendment and

6    not a failure by Respondent to object which resulted in Petitioner's failure to secure amendment

7    of the Petition before judgment was entered.  Petitioner's contention of inequity in this regard

8    is not well taken, and the Court will not recognize the Petition as having been amended as a

9    result of his first footnoted request.  In any event, as discussed below, the statute of limitations

10   expired for the vast majority of the new claims in December 2002, and amendment as of

11   Petitioner's June 2004 footnoted request would not save those new claims from the running of

12   the statute of limitations.

13                        **2.  September 13, 2006**

14         Petitioner's next request to amend the Petition was presented in the motion for stay and

15   abeyance filed on January 28, 2008, where counsel for Petitioner argued, again in a footnote, that

16   the Ninth Circuit had effectively granted his motion to amend the Petition in its September 13,

17   2006, order, but if this Court did not agree, then he "moves to amend."  (Doc. No. 113 at 2 n.1.)

18   The stay and abeyance motion was summarily granted without addressing Petitioner's argument

19   and without reference to his footnoted "motion" to amend.  (Doc. No. 118.)  Petitioner argued

20   then, as now, that the Ninth Circuit must have recognized that the Petition had been amended

21   to include the new claims because it dismissed them without prejudice.  (Pet.'s Reply at 38.)

22         If the Ninth Circuit had recognized that the Petition had been amended to include the new

23   unexhausted claims, as Petitioner contends, the Ninth Circuit would likely have remanded with

24   instructions to dismiss the mixed petition or afford Petitioner options to avoid dismissal, rather

25   _____

26         [3] Petitioner argued in the Ninth Circuit that his new allegations of deficient performance should
     be considered under Kimmelman irrespective of his failure to present them to the state court, and that
27   this Court erred in failing to do so.  (See App.'s Reply Br. filed 1/23/06 in Watson v. Rocha, No. 05-
     55310 at 25.)  That argument was obviously rejected when the Ninth Circuit ruled that it was "barred
28   from considering the merits" of the claim which was predicated on allegations which had not been
     presented to the state court.  (Doc. No. 109 at 6-7.)

than to have affirmed the denial of habeas relief as to all claims other than the two new alibi witnesses, remanded for an additional evidentiary hearing with respect to those two individuals, and dismissed the appeal as to the unexhausted claims.  Rose, 455 U.S. at 514, 520-21.  The Ninth Circuit likely recognized that the allegations that trial counsel failed to contact the two new additional alibi witnesses (one who was mentioned in the original state proceedings and both of whom, as discussed below, could merely corroborate the alibi provided by the potential alibi witnesses identified in the Petition) were timely because, as set forth below, they clearly relate back to the claim in the original, timely Petition alleging counsel was ineffective for failing to contact the three potential alibi witnesses identified in the original Petition, and were exhausted because they did not change the nature of that claim.  See Aiken v. Spalding, 841 F.2d 881, 884 n.3 (9th Cir. 1988) (holding that new evidence presented by a federal habeas petitioner which was not presented to the state courts renders a claim unexhausted where it "places his claim in a significantly different and stronger evidentiary posture than it had when presented in state court."), citing Vasquez v. Hillery, 474 U.S. 254, 259 (1986) (holding that new factual allegations presented to a federal habeas court in support of a claim already presented to the state courts will render the claim unexhausted if the new allegations "fundamentally alter the legal claim already considered by the state courts.")

As set forth below, the Court agrees with Petitioner that the addition of the two new alibi witnesses did not place the original ineffective assistance of trial counsel claim in a significantly different or stronger evidentiary posture, or fundamentally alter the nature of the claim. Moreover, the Ninth Circuit's order here did not "dismiss" the unexhausted claim which relied on the new allegations of deficient performance as Petitioner contends, or rule upon it at all, but "dismiss[ed] the appeal" as to that claim after finding that it was "barred from considering [its] merits."  (Doc. No. 109 at 7); see Ahiswede v. Wolff, 720 F.2d 1108, 1109 (9th Cir. 1983) ("[T]he only issues properly before this court are those that are in the petition.").)  Thus, the Ninth Circuit did not recognize the Petition as having been amended to include the unexhausted ineffective assistance claim predicated on the new allegations of deficient performance, and the Court denies Petitioner's request to recognize constructive amendment of the Petition as of the

1    September 13, 2006 Ninth Circuit order.

2                          **3.  January 28, 2008**

3           The Court agrees with Petitioner's final argument that the Petition was constructively

4    amended as of this Court's February 27, 2009, order granting stay and abeyance.  (Pet.'s Reply

5    at 39-40.)  That order granted stay and abeyance *nunc pro tunc* to January 28, 2008.  (Doc. No.

6    118.)  Petitioner requested stay and abeyance under the <u>Rhines</u> procedure, which holds a mixed

7    petition in abeyance while a petitioner returns to state court to exhaust, after the petitioner has

8    demonstrated good cause for the failure to timely exhaust and after a determination has been

9    made that the claims are not on their face "plainly meritless."  <u>Rhines</u>, 544 U.S. at 277-78.

10          In opposing Petitioner's motion, Respondent contended that <u>Rhines</u> procedure was not

11   appropriate because the Petition was not mixed.  (<u>See</u> Doc. No. 114 at 1-4.)  The summary order

12   granting stay and abeyance does not provide any information regarding the basis for granting

13   the motion.  (Doc. No. 118.)  There is understandable reliance by Petitioner that by granting his

14   <u>Rhines</u> stay and abeyance motion the Court determined that the Petition had been constructively

15   amended, *nunc pro tunc* to January 28, 2008, to include the claims which Petitioner intended to

16   return to state court and exhaust.  Respondent was likewise on notice that the Court had

17   impliedly recognized such an amendment, and Respondent did not seek clarification of the order.

18   However, even if there were *sub silentio* findings in that order that the Petition had been

19   constructively amended and Petitioner had shown good cause for the failure to timely exhaust

20   claims which were not facially meritless, the Court will not read into that order *sub silentio*

21   findings that the new claims necessarily relate back to the original petition or were timely under

22   the one-year statute of limitations.  Rather, those issues are considered below.

23          **C.     Conclusion**

24          The Court **GRANTS** in part and **DENIES** in part Petitioner's request for amendment.

25   The Court finds that the Petition was constructively amended on February 27, 2009, *nunc pro*

26   *tunc* to January 28, 2008, to include the new ineffective assistance of trial counsel claim

27   predicated on the individual and cumulative effect of the new allegations of deficient

28   performance, and the new <u>Brady</u> claim alleging it appears likely the prosecutor withheld

1  evidence.

2

3  **III.    Factual and Legal Background**

4         Prior to addressing the procedural default and statute of limitations issues which, as

5  discussed below, require comparison between the newly exhausted claims and the claims

6  presented in the Petition and Traverse, as well as a determination regarding whether the new

7  allegations of deficient performance rise to the level of a constitutional violation, and in order

8  to provide context, the Court will review the evidence presented at trial.  The Court will then

9  review the basis for the adjudication of the claims presented in the Petition and Traverse by the

10  state appellate court, the state supreme court, this Court, and the Ninth Circuit.

11         **A.    Trial proceedings**

12         Sarena "Mimi" Haley, Lasean "Rebloc" Harriel, April Davis, Evangalina "Vangie" Tei,

13  and Avion "Tootie" Tuimalo were with Petitioner (aka "Fango") and James "Baby Gangster"

14  Williams at the Seven Gables motel in Oceanside, California, in the early morning hours of

15  March 15, 1996. (Resp.'s Lodgment B, Reporter's Tr. ["RT"] at 14-21.) Haley and Harriel pled

16  guilty to robbery of Williams based on the events which transpired at the Seven Gables motel,

17  and had served their sentences and been released prior to trial; they both invoked their Fifth

18  Amendment right and refused to testify.  (RT 21, 34.)  Prior to trial, Avion Tuimalo's attorney

19  stated that Tuimalo was a juvenile living in Los Angeles who was currently on probation as a

20  result of a robbery conviction she suffered based on the events that night, and that she wished

21  to invoke her Fifth Amendment right and refuse to testify.  (RT 25.)  Petitioner's trial counsel

22  stated that he had spoken to Tuimalo and believed she would testify if granted immunity.  (RT

23  25, 308-09.)  The prosecutor stated that if Petitioner's trial counsel could convince Tuimalo to

24  come down from Los Angeles, his office was willing to grant her immunity.  (RT 26.)

25  Petitioner's trial counsel also indicated that he wished to call Lasean Harriel as a witness but the

26  prosecutor had declined to provide him with immunity.  (RT 308.)

27         April Davis testified under a grant of use immunity; she was in custody at the time of her

28  testimony after being convicted of robbery for her role in the events that night.  (RT 40, 76-77.)

-13-

01cv1780

She testified that she was fourteen years old on March 14, 1996, and came down from Compton in Los Angeles to Oceanside near San Diego that evening with her friend Tuimalo and their friend "Awol." (RT 60-61, 76.) They smoked marijuana and ingested PCP, and met Tuimalo's sister Haley, along with Tei and Harriel; Petitioner picked them up in a car belonging to Charles Hammer which Hammer had lent to Haley, and Petitioner drove them (Davis, Tei, Tuimalo, Haley and Harriel) to the Seven Gables motel. (RT 63-73, 92, 130, 154, 240-44.)

Davis testified that at some point that evening Petitioner brought Williams to the motel room, put a gun to his head and told him to take off his clothes. (RT 77-80.) Williams stripped down to his underwear, was tied up with his own shoelaces, and was hit by Haley and Tei with a table leg. (RT 81-82.) Petitioner hit Williams in the head with a gun and asked him where Williams' friend "Dirt" was, and Williams told Petitioner where to find Dirt. (RT 84-88.) Davis testified that Petitioner said he thought Dirt and a person named "Termite" were "snitches." (RT 93.) Davis said Petitioner told her to shoot Williams but she refused; Petitioner then threatened to kill Davis and put the gun to her head and pulled the trigger three times, but it did not fire. (RT 89-92.)

Davis testified that Petitioner ripped Williams' shirt and used a strip of cloth to cover his eyes; Petitioner, Williams, Davis, Tuimalo and Harriel then got back in Hammer's car; Williams had blood on his face at that time, his hands were tied, and Petitioner held a gun at his back. (RT 95-97, 100-01.) Petitioner drove them "a long ways" and let Williams out in a residential area; Petitioner fired the gun in the air and then drove the group, absent Williams, to the Coast Inn, which is located in another part of Oceanside. (RT 101-03, 189.) Shortly after the group arrived at the Coast Inn, Petitioner got out of the car when he saw Dirt walk into the parking lot. (RT 104-07, 110.) Davis watched as Petitioner pointed the gun at Dirt from two feet away, asked him "What's up?" and shot him in the neck. (RT 109-15.) Petitioner got back in the car and drove away. (RT 115-16.) Davis was cross-examined by Petitioner's trial counsel about her previous refusals to testify, her grant of immunity, her concern about being prosecuted as an accomplice or accessory to the murder, her alcohol and drug use, and inconsistencies between her trial and preliminary hearing testimony. (RT 120-23, 128-35, 141-42.)

Evangalina Tei testified under a grant of immunity that she and her cousin Mimi Haley were driving around Oceanside in a car Hammer had loaned Haley, and eventually met up with Harriel, Davis, Tuimalo and Petitioner, who was Haley's friend. (RT 145-52, 205-06, 240-44.) They drove together to the Seven Gables motel, which is at the far south side of Oceanside, arriving around 10:00 p.m. (RT 152-53.) Tei registered in room number four and all six of them (Tei, Haley, Harriel, Davis, Tuimalo and Petitioner) went inside and began to drink alcohol they had purchased on the way; at one point Tei and Haley walked to the store to get more alcohol; Tei said she drank "a lot" while at the motel. (RT 155-60.) About an hour after they arrived, Petitioner, brandishing a handgun, brought Williams into the room at gunpoint. (RT 161-65.) Petitioner ordered Williams to take off his clothes and jewelry; Harriel and Petitioner took jewelry, money, drugs and a pager from Williams. (RT 167-70.) Petitioner "pistol whipped" Williams in the face and asked him the whereabouts of Williams' "homies" Dirt, Honeywood and Termite; Williams was in the room for about two or three hours. (RT 171-74.) Tei said Petitioner wanted to know where Dirt, Honeywood and Termite were because Petitioner "was looking for them because he wanted to know who told on him," or, in Petitioner's words, who had "snitched" on him. (RT 175-76.) Tei testified that Williams told Petitioner that Dirt was at the Coast Inn; Tei said she hit Williams once on his body with a table leg. (RT 176-77.)

Tei testified that she and Haley tied Williams' hands behind his back with strips of cloth ripped from his shirt, and tied his feet with his shoelaces. (RT 179-82.) Haley left the motel alone in a taxi after arguing with Petitioner. (RT 182-83.) Everyone else, including Williams, left in Hammer's car at about 2:00 or 3:00 a.m. with Petitioner driving; Williams was untied and dressed at that time but shirtless. (RT 183-85.) They dropped Williams off about three miles from the Seven Gables motel and about 1.2 miles from the Coast Inn; Petitioner fired a shot in the air and they drove away. (RT 186-87, 291-92.)

Tei said they (Petitioner, Tei, Harriel, Tuimalo and Davis) then drove to the Coast Inn; on the way Petitioner said he wanted to talk to Dirt because when Petitioner "was locked up, someone had told on him [and] he wanted to know who." (RT 188-89, 192-93.) They arrived at the Coast Inn about 4:15 a.m. and Petitioner saw Dirt in the parking lot. (RT 191, 194.) Tei

heard Petitioner tell Dirt he was from "Eastside CMG," a reference to Petitioner's gang affiliation. (RT 196.) Tei was speaking to Tuimalo and not paying attention to Petitioner when she heard a gunshot; Petitioner was the only person who Tei saw with a gun that night. (RT 195-98.) Tei saw Dirt on the ground as Petitioner got in the car. (RT 199-201.) They drove to a Motel 6. (RT 201.) Tei admitted she had been convicted of robbery based on the events that night, and was cross-examined regarding her grant of immunity, her alcohol use that night, her past drug use, and inconsistencies between her trial testimony, preliminary hearing testimony, and police statements. (RT 204-23.)

A medical examiner testified that Dante "Dirt" Atkins died from a gunshot wound through the neck fired from several inches away. (RT 235-38, 266, 288.) Charles Hammer testified that he owned the car Haley and Petitioner were driving on the night of the homicide, and that he had loaned the car to Haley that afternoon. (RT 240-44.) An Oceanside police officer testified that when he arrived at the Seven Gables motel the manager was inside room number four putting a table back together; the officer told the manager to disassemble the table and put the pieces back where he had found them. (RT 253.) Shoelaces and shirt fragments were found in a search of a dumpster in the parking lot of the Seven Gables. (RT 253-54.) The first officer to arrive at the Coast Inn arrived at approximately 4:40 a.m. (RT 263-64.) The lead detective on the case testified that he searched the room where Petitioner lived and found a newspaper article regarding the murder of Atkins, which contained a photograph of the crime scene, between Petitioner's mattress and box spring. (RT 289-90.) The people rested.

Petitioner's trial counsel informed the court that he had arranged for Tuimalo to testify, but that she had informed his investigator just that day that she had spoken with an attorney the day before who had advised her not to testify. (RT 308.) Petitioner's trial counsel stated that he believed she would testify if granted immunity, but the prosecutor had refused to provide her with a grant of immunity. (RT 308-09.) Petitioner's counsel had a report from his investigator, John Atwell, stating that Atwell had spoken to Tuimalo and she had told him that the incident at the Seven Gables motel came about because Williams had been stalking and terrorizing Tuimalo, Haley and their friends. (Resp.'s Lodgment A, Clerk's Tr. ["CT"] at 38-41.) Tuimalo

said Williams was terrorizing them because they knew that Williams had been involved in a double shooting in 1993 involving rival factions of the Crips street gang, and they "could finger him to the authorities."  (Id.)  Tuimalo said Williams had knocked on their door at the Seven Gables motel that evening purely by chance, that what happened to Williams in the room was payback for his having terrorized them, and that they dropped Williams off in order to get rid of him because they did not want him around.  (Id.)  Tuimalo told Atwell that after they dropped off Williams, they dropped her off and she had no information regarding the rest of the evening.  (Id.)  Tuimalo informed the investigator that there was no mention of "Dirt" while in the motel room, and that in her opinion Davis was a chronic liar and a "Ho," which she defined as a woman who gives her body "to whatever gangbanger wanted it."  (Id.)  Tuimalo told Atwell that Davis may have been willing to sell out Petitioner in order to gain favor with a rival Crips faction in Los Angeles.  (Id.)  Atwell's written report does not mention Petitioner, and Tuimalo's statement neither confirmed nor denied that Petitioner was present or involved.  (Id.)

The defense called as its only witness a psychiatrist who testified regarding the effects of PCP, alcohol and marijuana on perceptions and memories.  (RT 316-24.)  Petitioner's trial counsel was sanctioned for a discovery violation for failing to disclose the psychiatrist as a witness until just before he testified.  (RT 274-75.)  Counsel explained that he had counted on Tuimalo testifying, and when she decided not to he contacted the psychiatrist as his only option to put on a defense.  (CT 37.)

On April 5, 1999, after deliberating a little less than four hours, the jury found Petitioner guilty of murder, robbery, kidnaping, assault with a firearm, and false imprisonment, all with the personal use of a firearm.  (CT 221-22.)  Immediately after the jury was excused, Petitioner engaged in a colloquy with the trial judge on the record complaining that the judge had failed to disclose that he knew one of the jurors.  (Pet.'s Ex. vol. IIB [Doc. No. 126] at 546-48; RT 421-22.)  On May 25, 1999, the day originally set for sentencing, Petitioner read a statement he had prepared to the trial judge complaining that he was deeply disturbed by the outcome of the trial because the prosecutor had falsely led the jury to believe that Atkins had snitched on Petitioner, which provided a false motive for him to kill Atkins because Atkins had not in fact

1    snitched on him.  (Id. at 552-55; RT 428-30.)  Petitioner did not complain or mention during

2    either address to the trial judge that an alibi defense had not been presented at his trial.

3         On August 20, 1999, Petitioner's trial counsel filed a motion for a new trial, stating that

4    due to the delay between the murder and his arrest Petitioner had forgotten where he was on the

5    night of the murder, but Paula White had read a newspaper account of the murder a few weeks

6    earlier and had recalled that Petitioner was with her that evening at her friend Nishea Larose's

7    anniversary party in Lemon Grove, California.  (CT 170-83.)  White provided a declaration

8    stating that she had known Petitioner for several years and had previously dated him, that he had

9    arrived in Lemon Grove about midnight on the evening of the murder, they argued about his

10   being late, and they stayed at Larose's apartment until the next morning when they went to

11   breakfast together.  (CT 174-75.)

12        At the hearing on the new trial motion, Petitioner's trial counsel argued that there was no

13   physical evidence in this case; rather, the evidence against his client was based on two unreliable

14   eyewitnesses, Tei and Davis, and that if White had been allowed to testify, the outcome of the

15   trial would have been different.  (Pet.'s Ex. vol. IIB at 561-63; RT 435-38.)  The court denied

16   the motion, finding that the credibility of Tei and Davis had been adequately challenged at trial

17   through their testimony and the expert witness, and that the alibi was not new evidence because

18   Petitioner had the opportunity to present evidence regarding where he was on the night of the

19   murder at trial, as he was initially arrested only five weeks after the murder.[4]  (Id. at 563-66; RT

20   438-41.)

21   **B.    State appellate proceedings**

22        Petitioner's appointed appellate counsel argued on direct appeal that his false

23   imprisonment conviction was a lesser included offense of kidnaping (an argument with which

24   the state court agreed), and that the evidence was insufficient to support the convictions because

25   the two main prosecution witnesses, Tei and Davis, were under the influence of alcohol or PCP,

---

[4]  Petitioner was initially arrested on April 23, 1996, but was released two days later without being charged; he was rearrested on September 3, 1996 and charged, but was released on October 21, 1997 when the charges were dismissed because the prosecution was unable to locate Davis to testify; Petitioner was arrested again on August 26, 1998, when the charges were refiled and has been in continuous custody ever since.  (Pet.'s P&A at 4, 25 n.38; CT 6, 197.)

01cv1780

had both been convicted of robbery, and were both granted immunity in exchange for their testimony. (Resp.'s Lodgment C, <u>People v. Watson</u>, No. D034448, slip op. at 2 (Cal.App.Ct. July 12, 2001.) Petitioner filed two pro se state habeas petitions, which were consolidated with the appeal. In one petition he alleged that the prosecutor had argued a false motive theory, and that his trial counsel was ineffective for failing to argue that the prosecution's motive theory was false, which he supported with allegations that Atkins was not the person who had informed on him. (<u>Id.</u> at 12-13.) In the other petition he alleged a <u>Brady</u> violation for failing to turn over information regarding an offer of immunity to Hammer, and presented a claim that his trial counsel was ineffective for failing to adequately cross-examine Hammer regarding the alleged immunity offer and for failing to interview or investigate potential alibi witnesses Paula White and Kristy Yard. (<u>Id.</u> at 8-9.) In addition to White's declaration, Petitioner presented an affidavit from Kristy Yard stating that she had been babysitting for Paula White the night of the murder, and that White had called her that night and told her she had arrived in San Diego but was waiting for Petitioner; White called again about 12:30 a.m., waking Yard up, to say that Petitioner had just arrived, at which time Yard spoke to Petitioner. (Pet.'s Ex. vol. IIB at 603.) Petitioner also presented an affidavit from Derek D. Morgan, which is not properly executed under penalty of perjury, which stated that he had given Petitioner a ride to Lemon Grove that night to be with a female friend of Petitioner's. (<u>Id.</u> at 685.) Petitioner presented a declaration from Charles Hammer, dated January 12, 2000, stating that a prosecution investigator had threatened him with prison unless he fabricated a story that he had loaned his car to Petitioner on the night of the murder, rather than the truth, which he testified to at trial, that he had loaned the car to Haley. (<u>Id.</u> at 600.)

The appellate court issued an opinion affirming Petitioner's convictions and denying the two contemporaneously-filed habeas petitions, stating in relevant part:

> On March 14, 1996, Watson brought James Williams, also known as "Baby Gangster" into a Oceanside motel room at gunpoint and over the course of several hours hit Williams with the gun, tied his legs and wrists, took his drugs, money and jewelry, and asked him the whereabouts of his friend Dante Lamar Atkins. Others were present during these events, including Watson's friend Mimi Haley,

her cousin Evangelina Tei, Lasean Harriel, Jan Tulimalo[5] and April Davis.  The group had checked into the room at 10:00 p.m., about an hour before Williams arrived.  Some of those people assisted Watson at times, including Tei, who hit Williams with a metal table leg.  Davis sat on a couch during the events.  Early the next morning, Watson approached Atkins in the parking lot of another hotel and fatally shot him.  [¶]  At Watson's trial, Davis and Tei testified under a grant of immunity about the events that occurred that night and the following morning.

\* \* \*

Watson challenges the sufficiency of the evidence supporting his convictions solely on the basis of Davis and Tei's credibility.  He asserts the fact they ingested drugs (in Davis's case) and alcohol (in Tei's case) during the evening in question, suffered robbery convictions, and accepted immunity from prosecution makes their testimony "inherently incredible as a matter of law."  [¶]  Watson does nothing more than ask us to impermissibly invade the jury's role by weighing the effect of the evidence and deciding matters of credibility. . . . [¶]  The jury was well aware of Davis and Tei's alcohol and drug use before arriving at the verdict. . . . [¶]  Both Davis and Tei were cross-examined on their alcohol and drug use that evening, as well as on inconsistencies between their preliminary hearing and trial testimony.  The jury learned that both had suffered robbery convictions, Tei's for her conduct on the evening in question, and that both were granted immunity for their testimony.  Consequently, the jury was given the opportunity to weigh Davis and Tei's credibility and decide whether to accept their stories with all of those facts before it.  We cannot second-guess the jury's determination in this regard.

\* \* \*

Watson contends his trial counsel was ineffective for (1) failing to adequately cross-examine a prosecution witness, Charles Hamer,[6] which would have revealed the prosecutor's investigator gave Hamer a "promise of immunity" in exchange for his testimony and (2) failing to interview or otherwise investigate and put on the stand two alibi witnesses, Paula White and Kristy Yard.  Watson further argues reversal is warranted because the prosecutor never turned over information about the prosecution's offer of immunity to Hamer under *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*).  [¶]  In support of his petition, Watson submits Hamer's declaration and letter dated January 12, 2000, in which Hamer states he was told by the prosecutor's investigator to fabricate his testimony about who borrowed his car on the night in question or suffer prison time.  There is no indication Watson's defense counsel was aware of this information either at the time of trial, which commenced in March 1999, or at the time of Watson's motion for new trial, which was first made in May 1999 and further heard and denied on October 7, 1999.  At trial, Hamer testified to what he says is the truth – that he loaned his vehicle at about the time in question to Mimi Haley. . . .  We cannot conclude that Watson's counsel was incompetent for failing to cross-examine Hamer about matters counsel did not know about nor could have reasonably suspected based on Hamer's truthful testimony.

---

[5]  There are different spellings and various first names for Tuimalo in the record, as well as various versions of Tei's first name.

[6]  Charles Hammer spelled his name at trial "Hammer."

We likewise reject Watson's claim that counsel was ineffective for failing to call potential alibi witnesses White and Yard. White's declaration, attached to Watson's petition, avers that in late July or early August 1999, after reading a newspaper article about Watson's murder charges, she recalled that at about 11:30 p.m. or 12:00 a.m. on the night in question, she had met Watson at a party in San Diego. Watson also submits Yard's affidavit, in which Yard states she recalled White and Watson attended a party in San Diego on March 14, 1996, and that White called her at 12:30 a.m. the next morning to inform her Watson had arrived. The record indicates White contacted Watson's counsel for the first time in July 1999 and that the potential alibi testimony was thereafter made the subject of a motion for a new trial. The court denied the motion after considering the information and concluding it was not truly newly discovered evidence because such an alibi could have been raised by Watson himself. Contrary to Watson's contention, the record indicates counsel had no knowledge of White's existence or her potential testimony in time to present her as a witness at trial. To the extent Watson contends his counsel was ineffective for failing to adequately investigate and locate White before trial, he has not sufficiently met his burden to show his counsel's incompetence. . . . There is no indication in the petition, either by Watson's declaration, declaration of counsel or otherwise, that counsel knew or should have known about White's existence or had any reason to investigate an alibi defense before trial.

Finally, we reject Watson's contention that the prosecution failed to reveal favorable evidence before trial, namely the prosecution investigator's offer of "immunity" to witness Hamer. . . . [¶] We cannot say the evidence regarding Hamer's offer of immunity, as Watson characterizes it, meets the *Brady* test for materiality. . . . While evidence that Hamer was offered immunity for his testimony may bear on the issue of Hamer's credibility, Hamer's declaration indicates he in fact did not receive any such benefit, nor did he agree to testify falsely as he claims he was asked to do. Even assuming Hamer was offered immunity for favorable testimony, that fact cannot be used as a basis for attacking the credibility of the other prosecution witnesses. As indicated, the jury was informed the prosecutor granted immunity to Davis and Tei, the People's two key witnesses. In any event, the evidence as to immunity, while usable for Hamer's impeachment, was immaterial to Watson's guilt or penalty. We conclude there is no reasonable probability that the evidence of the prosecution's offer of immunity to Hamer would have resulted in a different outcome regarding Watson's guilt.

In his second petition, Watson argues his conviction resulted from a theory advanced by the prosecutor based upon false evidence, namely that Atkins "snitched" on Watson and therefore Watson was motivated to kill Atkins by revenge. He maintains the falsity of this theory is exhibited by his arrest record, which shows Atkins was not the informant to whom he sold cocaine. Watson argues the jury was misled by the prosecution's erroneous theory of motive and further that his counsel was ineffective in failing to argue that the People's theory was based on false evidence.

Watson has failed to meet his burden of proof as to this ineffective assistance of counsel claim. First, we find no support for his assertion that his arrest report establishes Atkins was not an informant. The arrest record attached to his petition merely states Watson sold rock cocaine to a "confidential informant" without identifying that person or ruling him or her out as Atkins. Second, evidence apart from Watson's arrest record supported the People's motive theory. Tei testified at trial that Watson asked about Atkins because he wanted to know who "snitched" on him. Counsel "need not do everything the defendant may personally desire, no matter how unmeritorious . . . Competent counsel is not

1    required to make all conceivable motions or to leave an exhaustive paper trail for
     the sake of the record.  Rather, competent counsel should realistically examine the
2    case, the evidence, and the issues, and pursue those avenues of defense that, to
     their best and reasonable professional judgment, seem appropriate under the
3    circumstances.  (Citations.)"  (*People v. Freeman* (1994) 8 Ca.4th 450, 509.)
     Under the circumstances, Watson's defense counsel would have a reasonable
4    tactical basis for failing to raise a claim of false evidence because there was
     simply no support for it.  We cannot conclude counsel was ineffective for failing
5    to make an apparently meritless argument that the prosecution based its case on
     false evidence.  [¶]  In any event, Watson has failed to demonstrate how he was
6    prejudiced, i.e., why it is reasonably probably a juror would have reached a verdict
     in his favor if he had different counsel or if his counsel had made this argument.

7

8    (Resp.'s Lodgment C, <u>People v. Watson</u>, No. D034448, slip op. at 3-14.)

9         Petitioner thereafter raised his claims in the state supreme court, where he presented for

10   the first time his own declaration stating that he had informed his trial counsel in September

11   1996, and again in March 1999, of White's existence, and claimed that he told counsel that he

12   was with White on the night of the murder.[7]  (Pet.'s Ex. vol. IIIA [Doc. No. 127] at 694-95.)  On

13   September 19, 2001, the state supreme court summarily denied relief without a statement of

14   reasoning or citation of authority.  (<u>Id.</u> at 700.)

15        **C.    Federal district court proceedings**

16        Prior to denying habeas relief, Judge Benitez found that the state court had made two

17   crucial factual findings: (1) that Petitioner's trial counsel had no knowledge of White's alibi

18   story prior to trial; and (2) that trial counsel had no reason to investigate an alibi defense before

19   trial. (11/17/04 Order Denying Petition at 10-12.)  Judge Benitez declared these findings to be

20   objectively unreasonable because Petitioner had alleged in the appellate court that he told his

21   attorney about White prior to trial, and had thereafter presented his own declaration stating as

22   much to the state supreme court, but the State had not submitted any evidence refuting

23   Petitioner's declarations.  (<u>Id.</u>)  Judge Benitez found that the evidence was therefore one-sided,

24   other than the "slim inferential evidence" that Petitioner did not mention his alibi defense when

25   he twice addressed the trial judge.  (<u>Id.</u>)  The Court expanded the record with interrogatories

26   propounded to Petitioner's trial counsel, who initially answered that he knew about the alibi

27   _____

28        [7]  Petitioner and his counsel prepared for trial twice, once after Petitioner was arrested and
     charged on September 3, 1996, and again after Petitioner was rearrested on August 26, 1998.  (Pet.'s
     P&A at 4, 25 n.38; CT 6, 197; RT 439.)

1    defense before trial, but then filed supplemental answers indicating he was wrong, that he had

2    not located his files at the time of his initial answers and had mis-remembered.  (Id. at 15.)

3    Petitioner's trial counsel then indicated, consistently with his later evidentiary hearing testimony,

4    that Petitioner did not tell him about White until after the trial.  (Id.)  The evidentiary hearing

5    was bifurcated between the performance and prejudice prongs of Strickland.  The performance

6    prong was held first in order to determine what Petitioner's trial counsel knew about White and

7    Yard, when he knew it, and what he did to investigate the alibi defense.  (Id. at 22.)

8           Four witnesses testified at the evidentiary hearing, Paula White, Petitioner, Petitioner's

9    trial counsel, and Petitioner's trial counsel's investigator John Atwell.  Petitioner testified that

10   he had known White for seven or eight years, that she was the mother of his child, that they had

11   previously lived together for several years, and that he has her name tattooed on his chest.  (May

12   23, 2004 Evidentiary Hearing Tr. at 42, 83-84.)  He said they had not spoken or been in touch

13   for three or four years when she paged him around 7:30 p.m. on the night of the murder.  (Id. at

14   42-45.)  He called White back and she told him she was in San Diego at a party at the home of

15   Petitioner's friend Nishea Larose.  (Id. at 43.)  Petitioner testified that Derek Morgan drove him

16   to the party; they left Oceanside around 9:30 or 10:00 p.m. that evening, and along the way they

17   stopped at the home of Petitioner's friend Ms. Bobbie Douglas, staying about half an hour.  (Id.

18   at 46-47.)  Petitioner said he and Morgan then proceeded to Larose's house where Morgan met

19   briefly with White before leaving; Petitioner spent the night at Larose's house with White, and

20   they went out to breakfast the next morning.  (Id. at 48.)  Petitioner testified that he gave his trial

21   counsel information about White, Douglas and Morgan, that he and trial counsel had six or seven

22   conversations about finding those witnesses, and that counsel told Petitioner that he had an

23   investigator looking for them.  (Id. at 49-55.)  Petitioner admitted he wrote a letter to counsel

24   dated July 30, 1999, in response to counsel informing him that he had been contacted by White,

25   in which Petitioner referred to his alibi as "newly discovered evidence."  (Id. at 66.)

26          Paula White's direct testimony was generally consistent with her declaration, but on

27   cross-examination she was vague and uncertain regarding many of the details.  (March 17, 2004

28   Evidentiary Hearing Tr. at 9-13, 15-29.)  She said she first contacted trial counsel in August

1   1999, and said that Larose was actually a friend of Petitioner's who she did not know very well,

2   not her friend as she had stated in her declaration. (Id. at 16, 27.)  White could have potentially

3   been impeached as a trial witness with her prior convictions for presenting a false identification

4   to a police officer, felony possession of marijuana for sale, and theft of personal property, as well

5   as with the nature of her relationship with Petitioner and the unusual circumstance of contacting

6   him for the first time in three or four years that very night. (Id. at 31.)

7        Petitioner's trial counsel, who had handled twenty to twenty-five murder cases before

8   Petitioner's trial, testified that in preparing for trial had he asked Petitioner if he had an alibi, and

9   Petitioner said he might have been in Lemon Grove that night and would have his people look

10   for information. (May 23, 2004 Evidentiary Hearing Tr. at 114-16.)  Counsel testified that

11   although Petitioner told him that Larose might be able to say she was with Petitioner on the night

12   of the murder, Petitioner also told him not to contact her because she would not help the case.

13   (Id. at 112.)  Trial counsel said that Petitioner never asked him if Morgan could testify at trial

14   and never informed him about Morgan. (Id. at 124-25.)  Investigator Atwell attempted to find

15   Douglas, but he could not locate an address. (Id. at 17-18.)  After the charges were initially

16   dismissed and Petitioner released from custody, he was taken into custody again when the

17   charges were refiled; at that time trial counsel said he again asked Petitioner if he had located

18   his alibi witnesses, but Petitioner answered "no." (Id. at 104, 114-15.)  When trial counsel

19   eventually spoke to White while preparing for the new trial motion, he said she was evasive,

20   vague and very difficult. (Id. at 124, 131.)  Counsel said that White refused to help him locate

21   witnesses supporting the alibi and refused to testify at the new trial motion because she did not

22   want to jeopardize her current romantic relationship by helping Petitioner, and that she said she

23   would not "lie for [Petitioner]." (Id. at 132.)

24        Following the evidentiary hearing, Judge Benitez found that Petitioner's trial counsel had

25   testified credibly when he said that he had asked Petitioner at the outset of his representation

26   whether he had an alibi, but Petitioner's answer was "sketchy" in that Petitioner said he might

27   have been somewhere else, told counsel that he "would look into finding out if he was

28   somewhere else," and that "my people will let you know where I was and who I was with."

1  (11/17/04 Order Denying Petition at 23-24.)  Judge Benitez also found there was no credible

2  alibi, and that trial counsel reasonably doubted that one existed, because (1) many actual and

3  potential witnesses placed Petitioner at the scene, including Davis, who testified at trial, and

4  Haley, who told trial counsel that she witnessed Petitioner murder Atkins and would not help

5  him, whereas only Petitioner and White placed Petitioner in Lemon Grove; (2) Petitioner never

6  mentioned White or Yard to trial counsel until after trial; and (3) White was not a credible

7  witness and trial counsel reasonably believed she had invented the alibi.  (Id. at 24-25.)  Judge

8  Benitez found that Petitioner was not a credible witness at the evidentiary hearing because:

9  (1) his testimony appeared to be rehearsed; and (2) he was not a bashful defendant or client, yet

10  never protested to the trial judge that no alibi defense had been presented nor asked for a new

11  attorney, even though he had twice spoken to the trial judge.  (Id.)  Finally, Judge Benitez found

12  that investigator Atwell had spoken to alibi witness Larose but apparently did not report back

13  with any favorable information, that trial counsel had given the name and address of potential

14  alibi witness "Bobbie" Douglas to Atwell but Atwell had reported that no such address existed,

15  and that Atwell was not credible regarding his criticism of trial counsel.  (Id. at 25.)

16       Judge Benitez denied habeas relief as to the alibi aspect of the ineffective assistance claim

17  based solely on the Strickland performance prong, without holding the prejudice prong of the

18  evidentiary hearing, after concluding that trial counsel had adequately carried out his duty to

19  investigate the possible alibi defense, without a discussion or analysis of Strickland's prejudice

20  prong.  (Id. at 25-26.)  The remaining claims presented in the Petition and Traverse were denied

21  based solely on the state court record, without addressing the new allegations of deficient

22  performance or the new Brady claim, and without ruling on Petitioner's request to amend the

23  Petition.[8]  (Id. at 25-37.)

24       **D.     Ninth Circuit proceedings**

25  _____

26       [8]  There is no mention of Morgan in the order denying habeas relief or in the Ninth Circuit's
    order, and no indication why he is not mentioned, but perhaps it is because Morgan never presented

27  properly sworn testimony, as his only affidavit is not properly executed under penalty of perjury (see
    Pet.'s Ex. at 685), or perhaps because Morgan's statement was considered to be cumulative to the

28  evidentiary hearing testimony of Petitioner and White, and the issue regarding whether Morgan's
    testimony was needed was reserved, if at all, for the prejudice prong of the evidentiary hearing, which
    was never held.

The Ninth Circuit affirmed the denial of Petitioner's claim that the prosecutor knowingly presented a false motive, and that his appellate counsel was ineffective for failing to raise that claim on appeal, agreeing with this Court and the state appellate court that the motive argued by the prosecutor (that Petitioner killed Atkins because Petitioner thought Atkins was a snitch) was supported by the testimony of Tei and Davis. (Doc. No. 109 at 4-5.) The Ninth Circuit affirmed the denial of the Brady claim presented in the Traverse which alleged that the prosecutor failed to turn over evidence of an alleged offer of immunity to Hammer, based on this Court's finding that Petitioner could not establish materiality under Brady because Hammer did not actually receive such an offer, and that he had in any case testified truthfully at trial.[9] (Id. at 5.)

The Ninth Circuit likewise affirmed the denial of the ineffective assistance of trial counsel claim alleging a failure to cross-examine Hammer as to the immunity offer because Petitioner could not establish prejudice under Strickland for the same reason he could not establish materiality under Brady.[10] (Id. at 5-6.) The Ninth Circuit also affirmed the denial of Petitioner's insufficiency of the evidence claim, finding that because it was the jury's responsibility to evaluate the credibility of Davis and Tei, and because their testimony if believed was sufficient to convict Petitioner, the state court's holding was not contrary to or an unreasonable application of clearly established federal law. (Id. at 6.)

The Ninth Circuit agreed with this Court that trial counsel did not know about alibi witnesses White and Yard until after trial and counsel was therefore not ineffective in failing to investigate or interview those witnesses, based on this Court's determination that trial counsel was the only credible witness at the evidentiary hearing. (Id. at 2-3.) The Ninth Circuit reversed with respect to the finding that trial counsel was not ineffective for failing to investigate potential alibi witness Douglas, reasoning that there was nothing in the record to indicate why counsel did

---

[9] Although this aspect of the prosecutorial misconduct claim was not contained in the Petition (see Pet. at 9), it had been exhausted, and Judge Benitez addressed the claim because Petitioner had attached Hammer's affidavit to the Petition and had raised the claim in the Traverse. (See 11/17/04 Order Denying Petition at 32, citing Traverse at 11.)

[10] Again, the Petition does not contain a claim alleging trial counsel failed to cross-examine Hammer, although Petitioner exhausted such a claim. (See Pet. at 7.) The Court addressed this claim because Petitioner raised it in the Traverse. (See 11/17/04 Order Denying Petition at 30, citing Pet. at 7 and Traverse at 5, 7.)

not follow up on his investigator's report stating that he could not find a Mr. Douglas when counsel knew that Douglas was a woman and a potential alibi witness.  (Id. at 3.)  The Court remanded with instructions to determine whether trial counsel had a reasonable explanation for the failure to follow up with Douglas.  (Id. at 4.)  The Ninth Circuit also found that this Court did not make specific findings regarding the reasonableness of trial counsel's failure to interview potential alibi witness Larose, and instructed that: "On remand, the district court should address this issue as well."  (Id.)

Finally, the Ninth Circuit found that Petitioner had not exhausted his claim that the cumulative effect of trial counsel's errors rendered his performance deficient, and dismissed the appeal without prejudice to the extent it raised an unexhausted claim because it was "barred from considering the merits" of any unexhausted claims.  (Id. at 6-7.)  The Ninth Circuit also rejected Petitioner's contentions that: (1) he was not given a full and fair hearing in this Court; (2) this Court had erred in deferring to the state court's findings of fact; and (3) this Court had improperly limited the evidentiary hearing to the alibi claim.  (Id. at 7-8.)  The Ninth Circuit found that although Judge Benitez had not abused his discretion in striking about a dozen declarations attached to Petitioner's his post-evidentiary hearing brief, the better course would have been to admit that evidence, and indicated that this Court is not precluded from considering those declarations on remand.  (Id. at 8.)

## IV.   Procedural Default

Respondent contends the newly exhausted claims are procedurally defaulted in this Court because the state court found them to be untimely and successive, citing Walker v. Martin, 562 U.S. ___, 131 S.Ct. 1120 (2011) (holding that California's timeliness rule is clearly established and consistently applied).  (Resp.'s Opp. at 15-16.)  Petitioner: (1) challenges the independence and adequacy of California's timeliness rule; (2) attempts to distinguish Walker on the basis that the petitioner in Walker did not attempt to explain the delay in presenting the claims whereas Petitioner gave the state court compelling reasons for the delay; (3) argues that imposition of a procedural default would be inequitable because Respondent effectively waived the affirmative defense of procedural default by waiting seven years to raise the issue; and (4) contends he can

establish cause and prejudice to excuse the default, or show that a fundamental miscarriage of justice would result by imposition of the default.  (Pet.'s Reply at 17-36.)  Petitioner contends there has been no delay in presenting the new <u>Brady</u> claim to the state courts because he is still unsure of its factual basis, and requests discovery to determine whether the prosecution withheld forensic evidence.  (<u>Id.</u> at 36-37.)

When a state court rejects a federal claim based upon a violation of a state procedural rule which is adequate to support the judgment and independent of federal law, a habeas petitioner has procedurally defaulted his claim in federal court.  <u>Coleman v. Thompson</u>, 501 U.S. 722, 729-30 (1991).  A state procedural rule is "independent" if it is not interwoven with federal law. <u>LaCrosse v. Kernan</u>, 244 F.3d 702, 704 (9th Cir. 2001).  A state procedural rule is "adequate" if it is "clear, consistently applied, and well-established" at the time of the default.  <u>Calderon v. United States District Court</u>, 96 F.3d 1126, 1129 (9th Cir. 1996).  The Court may still reach the merits of a procedurally defaulted claim if the petitioner can demonstrate cause for his failure to satisfy the state procedural rule and prejudice arising from the default, or if he can demonstrate that a fundamental miscarriage of justice would result from the Court not reaching the merits of the defaulted claims.  <u>Coleman</u>, 501 U.S. at 750.

Petitioner presented the new <u>Brady</u> claim and the new ineffective assistance of trial counsel claim to the state trial court in a habeas petition on June 8, 2007.  (Pet.'s P&A Ex. vol. V at 1775-1841.)  The trial court issued an order to show cause on August 27, 2007.  (<u>Id.</u> at 1754-57.)  Respondent filed a return on February 29, 2008, and Petitioner filed a Reply on June 2, 2008.  (<u>Id.</u> at 1759-63.)

The trial court denied the petition in an eight-page order filed September 23, 2008.  (<u>Id.</u> at 1764-71.)  With respect to the new allegations of deficient performance, the court found that Petitioner had failed "to establish a reasonable probability that without counsel's errors, the result of the proceeding would have been different."  (<u>Id.</u> at 1767-70.)  Regarding the timeliness of the claims, the trial court stated:

> Further, these are matters which were evident form the trial transcript and should have been challenged on appeal.  "Contentions which could have been raised on appeal or which were raised and rejected on appeal ordinarily cannot be renewed in a petition for habeas corpus because habeas corpus ordinarily cannot

1   serve as a second appeal." <u>In re Dixon</u> (1953) 41 Cal.2d 756; <u>In re Waltreus</u>

2   (1965) 62 Cal.2d 218.

3   (<u>Id.</u> at 1770-71.)

4         The trial court also rejected the <u>Brady</u> claim, noting that the Deputy District Attorney and

5   a police detective had filed declarations indicating that no exculpatory evidence existed which

6   had not been provided to Petitioner, and that although some physical evidence had been

7   collected it was not tested because the prosecution did not think it was relevant to the case. (<u>Id.</u>

8   at 1771.)  The trial court found that none of the evidence which was collected was exculpatory,

9   and that the lack of forensic evidence from the Seven Gables motel where Williams was

10   supposedly tied to a chair and beaten might be due to efforts by the motel employees to clean

11   the room before the police intervened.  (<u>Id.</u> at 1770-71.)  The trial court noted that physical

12   evidence (shoelaces and black cloth) consistent with the testimony of Tei and Davis was found

13   in a dumpster at the Seven Gables motel, and that the extent of Williams' injuries was unclear

14   from the evidence presented at trial, although the probation report indicated that Williams

15   complained of scalp injuries.  (<u>Id.</u> at 1770.)  Petitioner filed a habeas petition in the appellate

16   court presenting the same claims, which was summarily denied.  (<u>Id.</u> at 1842-1958; Resp.'s

17   Lodgment K, <u>In re Watson</u>, No. D053963, order at 1 (Cal.App.Ct. April 7, 2009).)

18         Petitioner presented the new claims to the state supreme court in a habeas petition filed

19   May 8, 2009, over seven years after his conviction became final.  (Pet.'s P&A Ex. vol. VI at

20   1960-2094.)  The state supreme court denied the petition with an order which stated: "The

21   petition for writ of habeas corpus is denied.  (See *In re Robbins* (1998) 18 Cal.4th 770, 780; *In

22   re Clark* (1993) 5 Cal.4th 750.)"  (<u>Id.</u> at 2095.)

23         In <u>Walker v. Martin</u>, the petitioner presented claims alleging ineffective assistance of

24   counsel to the California Supreme Court nearly five years after his conviction became final,

25   without providing any reason for the long delay, and, as here, the petition was denied with

26   citations to <u>In re Robbins</u>, 18 Cal.4th 770, 780 (1998) and <u>In re Clark</u>, 5 Cal.4th 750 (1993).

27   <u>Walker</u>, 131 S.Ct. at 1124.  The <u>Walker</u> Court recognized that <u>Robbins</u> and <u>Clark</u> are cited by

28   the California Supreme Court, and in particular page 780 of the <u>Robbins</u> opinion (which was

1  cited here), when that court signals "that a habeas petition is denied as untimely." Id.  That is,

2  the California Supreme Court signaled that the petitioner had failed to seek habeas relief without

3  "substantial delay" as "measured from the time the petitioner or counsel knew, or reasonably

4  should have known, of the information offered in support of the claim and the legal basis for the

5  claim," and had failed to carry "the burden of establishing (i) absence of delay, (ii) good cause

6  for the delay, or (iii) that the claim falls within an exception to the bar of timeliness." Walker,

7  131 S.Ct. at 1125, quoting Robbins, 18 Cal.4th at 780, 787.  The Court held that California's

8  timeliness rule is clearly established and consistently applied. Walker, 131 S.Ct. at 1128-31.

9       Petitioner first challenges the independence of California's timeliness bar.  (Pet.'s Reply

10  at 24-26.)  However, the Ninth Circuit has held that California's timeliness bar is independent,

11  and this Court is bound by that holding.  See Bennett v. Mueller, 322 F.3d 573, 581 (9th Cir.

12  2003) ("We conclude that because the California untimeliness rule is not interwoven with federal

13  law, it is an independent state procedural ground, as expressed in *Clark/Robbins*.")

14       Petitioner next challenges the adequacy of California's timeliness rule.  The adequacy of

15  a state procedural rule "is not within the State's prerogative finally to decide; rather, adequacy

16  'is itself a federal question.'"  Lee v. Kemma, 534 U.S. 362, 375 (2002), quoting Douglas v.

17  Alabama, 380 U.S. 415, 422 (1965).  Although Walker found California's timeliness rule to be

18  clearly established and consistently applied, Petitioner correctly observes that the Walker Court

19  noted that a petitioner might be able to show the rule to be inadequate in his or her own case by

20  showing that "the California Supreme Court exercised its discretion in a surprising or unfair

21  manner." Walker, 131 S.Ct. at 1130 ("A state ground, no doubt, may be found inadequate when

22  discretion has been exercised to impose novel and unforeseeable requirements without fair or

23  substantial support in prior state law.") (citation and internal quotation marks omitted); see also

24  Kemma, 534 U.S. at 376 (recognizing exceptions where "exorbitant application of a generally

25  sound rule renders the state ground inadequate to stop consideration of a federal question.")

26       Petitioner contends it was unfair for the California Supreme Court to impose a procedural

27  bar here because he "did not dawdle nor sand-bag, he acted in a practical and judicially efficient

28  manner, while the State sat silent."  (Pet.'s Reply at 25.)  Petitioner contends that once the Ninth

1   Circuit held on September 13, 2006 that the new facts and claims would not be considered until

2   they were exhausted, he promptly (on February 7, 2007) placed Respondent on notice during a

3   status conference that he intended to seek stay and abeyance, and promptly (on June 8, 2007)

4   took the claims back to state court after realizing his informal request for a stay would not be

5   ruled upon in a timely manner.  (Id. at 38.)  He also contends that because the state trial and

6   appellate courts considered the merits of the claims in the alternative to untimeliness,

7   enforcement of a procedural bar here would be unfair and serve no perceivable state interests.

8   (Id., citing Kemma, 534 U.S. at 378 (observing that a generally applicable rule could, in an

9   atypical instance, serve "no perceivable state interest.").)

10       As set forth above, the trial court rejected Petitioner's new claims on the merits as an

11  alternative to finding they were obvious from the trial record and therefore untimely.  The

12  appellate court summarily denied the subsequent habeas petition, presumably for the same

13  reasons provided by the trial court.  See Ylst v. Nunnemaker, 501 U.S. 797, 803-06 (1991)

14  (holding that where there has been one reasoned state judgment rejecting a federal claim, later

15  unexplained orders upholding that judgment or rejecting the same claim presumably rest upon

16  the same ground).  Neither the trial nor the appellate court opinions support a finding that those

17  courts approved any reason for excusing Petitioner's delay, and the fact that they reached the

18  merits in the alternative to imposing procedural bars provides no support for Petitioner's

19  contention of unfairness.  See Harris v. Reed, 489 U.S. 255, 264 n.10 (1989) (holding that "as

20  long as the state court explicitly invokes a state procedural bar rule as a separate basis for

21  decision" the fact that the state court also reached the merits of the claims does not prevent the

22  claims from being procedurally defaulted.)  In any case, the relevant state court opinion for

23  procedural default purposes is the state supreme court opinion, which clearly imposed a

24  procedural bar.  See id., 489 U.S. at 263 ("a procedural default does not bar consideration of a

25  federal claim on either direct or habeas review unless the last state court rendering a judgment

26  in the case clearly and expressly states that its judgment rests on a state procedural bar.")

27       Petitioner argued in the state supreme court that his untimeliness should be excused

28  because "it would have been inefficient to pursue the same relief on arguably identical, or at

-31-                                                    01cv1780

1   least closely-related, grounds concurrently in both State and federal habeas proceedings. . . . [and
2   because counsel was confident] that the federal court would provide the remedy sought, . . . there
3   was no good reason to burden the State courts with concurrent litigation aimed at the same
4   remedy." (Pet.'s Ex. vol. V at 2087-88.) Although Petitioner contends he discovered the new
5   claims when preparing for or during the evidentiary hearing in 2003 and 2004, as set forth below
6   in the statute of limitations discussion, the trial court was correct in finding that the claims were
7   evident from the 1999 trial record.

8        The state supreme court obviously rejected Petitioner's "judicial efficiency" excuse when
9   it found the new claims to be untimely, and it clearly serves state interests to reject such an
10  excuse. See Walker, 131 S.Ct. at 1124-25 (the California Supreme Court requires a petitioner
11  to seek habeas relief without "substantial delay" as "measured from the time the petitioner or
12  counsel knew, or reasonably should have known, of the information offered in support of the
13  claim and the legal basis for the claim."), quoting Robbins, 18 Cal.4th at 780. The state interest
14  in requiring a petitioner to seek habeas relief without substantial delay is not in any manner
15  undermined merely because Petitioner believed he was proceeding with his claims in a judicially
16  efficient manner based on his hope that he would receive federal habeas relief. In fact, the stay
17  and abeyance procedure approved of in Rhines is based on the opposite proposition, the "simple
18  and clear instruction to potential litigants: before you bring any claims to federal court, be sure
19  that you first have taken each one to state court." Rhines, 544 U.S. at 276-77, quoting Rose, 455
20  U.S. at 520. It is obvious that the time to present the new claims was in one of the two habeas
21  petitions which were filed contemporaneously with Petitioner's direct appeal, not in a third
22  habeas petition filed over seven years after direct appeal ended. In any case, there is no reason
23  for Petitioner not to have immediately returned to state court upon "discovering" the new claims
24  in preparation for the federal evidentiary hearing, and no reason to rely on the Ninth Circuit to
25  instruct him that the claims could not provide a basis for federal habeas relief unless they were
26  exhausted. However, even if Petitioner had returned to state court around the time of the federal
27  evidentiary hearing, it appears the state court would still have imposed a timeliness bar based
28  on the delay in presenting claims which were obvious from the trial record.

1    Petitioner's contention that equitable considerations weigh against upholding a procedural

2    default because Respondent waited seven years to raise the defense is also not well taken.

3    Respondent in fact raised timeliness objections when Petitioner requested a stay and abeyance

4    (Doc. Nos. 114, 116), and raised the procedural default argument in the first brief filed following

5    the state court's imposition of a procedural bar. (Doc. No. 138.)  Respondent's failure to object

6    to Petitioner raising unexhausted claims in his post-evidentiary hearing brief (assuming an

7    objection would even have been appropriate), or this Court's failure to address Petitioner's

8    footnoted request to amend the Petition to include the unexhausted claims, does not excuse

9    Petitioner's failure to timely present the claims to the state courts.   In sum, Petitioner's

10   contention that it was unexpected or unfair for the state court to impose a procedural bar because

11   he was proceeding in a judicially efficient manner with Respondent's tacit approval is not

12   sufficient to demonstrate that the timeliness bar is inadequate in this case.

13   Petitioner next argues that imposition of the timeliness bar by the state supreme court

14   discriminates against federal claims and federal litigants because it assumes he received a

15   fundamentally unfair trial yet prevents him from taking his untimely claims to federal court.

16   (Pet.'s Reply at 27-28.)  First, there is no indication that the state court assumed Petitioner

17   received an unfair trial.  Rather, the state trial court (and presumably the state appellate court)

18   rejected the new claims on their merits as well as on procedural grounds.  As discussed below

19   in the prejudice section, the new allegations do not support a finding that the trial was unfair or

20   that counsel provided deficient representation.  Second, Petitioner was not prevented from

21   receiving a ruling on the merits of his new claims in the state trial and appellate courts, but was

22   merely denied discretionary review in the state supreme court by operation of the state bar

23   against untimely claims.  Finally, even to the extent Petitioner has been prevented from

24   presenting his claims due to the state procedural rules, it was his failure to identify and present

25   the claims on appeal or in the contemporaneously filed post-conviction collateral review

26   proceedings that caused the loss, not any "unexpectedly or freakishly" applied state procedural

27   rule.  Walker, 131 S.Ct. at 1130.

28   Accordingly, the newly exhausted claims are procedurally defaulted.  This Court can

1   reach the merits of these claims only if Petitioner can establish cause and prejudice to excuse the

2   default, or demonstrate that a fundamental miscarriage of justice would result from the failure

3   to reach the merits of the defaulted claims.

### A.   Cause

5   The cause prong can be satisfied if Petitioner demonstrates some "objective factor" that

6   precluded him from raising his claims in state court, such as interference by state officials or

7   constitutionally ineffective counsel.  <u>McCleskey v. Zant</u>, 499 U.S. 467, 493-94 (1991).  In

8   <u>Edwards v. Carpenter</u>, 529 U.S. 446 (2000), the Supreme Court stated:

> Although we have not identified with precision exactly what constitutes "cause" to excuse a procedural default, we have acknowledged that in certain circumstances counsel's ineffectiveness in failing properly to preserve the claim for review in state court will suffice. [*Murray v. Carrier*, 477 U.S. 478, 488-89 (1986)]  Not just any deficiency in counsel's performance will do, however; the assistance must have been so ineffective as to violate the Federal Constitution. *Ibid*.  In other words, ineffective assistance adequate to establish cause for the procedural default of some *other* constitutional claim is *itself* an independent constitutional claim.  And we held in *Carrier* that the principles of comity and federalism that underlie our longstanding exhaustion doctrine. . . require *that* constitutional claim, like others, to be first raised in state court.  "(A) claim of ineffective assistance," we said, generally must "be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default." *Carrier*, *supra*, at 489.

17   <u>Edwards</u>, 529 U.S. at 451-52.

18   Petitioner first contends that Judge Benitez has already found that he has shown good

19   cause for his failure to timely present the claims to the state courts by granting his motion for

20   stay and abeyance. (Pet.'s Reply at 29-30.)  Petitioner argues that because he has shown good

21   cause under <u>Rhines</u>, the law of the case doctrine requires a finding that he has shown cause to

22   excuse the default. (<u>Id.</u> at 30.)  He reiterates that the reason for the initial delay in presenting the

23   claims to the state courts was the fact that he did not discover the more compelling instances of

24   deficient performance until late 2003 and early 2004. (<u>Id.</u> at 30-31.)  He contends that the three-

25   year delay from discovering the claims until he presented then to the state court in 2007 was

26   wholly attributable to his "logical choice to fold the new facts into the on-going federal

27   litigation, an approach to which the State did not object." (<u>Id.</u> at 31.)  Petitioner states that

28   because he has not been able to find any case law that bears on this situation, the Court should

1   look to the equitable concerns underlying the procedural default rule.  (Id. at 32.)

2         Petitioner's attempt to equate the "cause" necessary to excuse a procedural default and

3   the "good cause" required to obtains stay and abeyance is unavailing.  The Supreme Court has

4   generally defined "cause" in relation to the procedural default doctrine as an objective factor

5   external to Petitioner which gave rise to the default.  Coleman, 501 U.S. at 730; Edwards, 529

6   U.S. at 451-52.  On the other hand, the Supreme Court has held that a petitioner's subjective

7   reasonable confusion about whether his unexhausted claims are time-barred in state court is

8   sufficient to establish good cause under the Rhines stay and abeyance procedure.  Pace v.

9   DiGuglielmo, 544 U.S. 408, 416 (2005).  Subjective reasonable confusion is a less exacting

10  standard than objective factors found sufficient to establish cause under procedural default

11  doctrine.  Edwards, 529 U.S. at 451-52; McCleskey, 499 U.S. at 493-94; Murray, 477 U.S. at

12  488 ("The uncertain dimensions of any exception for 'inadvertence' or 'ignorance' furnish an

13  additional reason for rejecting [those as a basis for cause].")

14        Furthermore, on remand in Rhines, the district court found that the definition of "good

15  cause" is more expansive that the cause required to overcome a procedural bar.  Rhines v.

16  Weber, 408 F.Supp.2d 844, 849 (D. S.D. 2005).  Although the Ninth Circuit has not defined the

17  exact contours of the good cause element under Rhines, other district courts, including this one,

18  have found that it is minimally exacting.  Hoyos v. Cullen, 2011 WL 11425 at *9 (S.D. Cal.

19  2011) (finding that "excusable neglect" satisfies the good cause standard) (unpublished

20  memorandum), citing Corjasso v. Ayers, 2006 WL 618380 at *1 (E.D. Cal. 2006) (same)

21  (unpublished memorandum); Briscoe v. Scribner, 2005 WL 3500499 at *2 (E.D. Cal. 2005)

22  (simply requiring "a *prima facie* case that a justifiable, legitimate reason exists which warrants

23  the delay of federal proceedings while exhaustion occurs.") (unpublished memorandum).

24        Moreover, the delay Rhines sought to avoid arises from a balance between the

25  congressional intent behind AEDPA, which is to reduce delays in the execution of state and

26  federal sentences, and the preservation of a petitioner's right to federal review of his or her

27  claims.  Rhines, 544 U.S. at 276-77.  Petitioner's stay and abeyance motion might well have

28  been granted based on those concerns, as the delay in presenting his claims to the state court

-35-                                                        01cv1780

might satisfy the balancing requirement of <u>Rhines</u> without demonstrating cause to excuse a procedural default. The <u>Edwards</u> Court recognized that a procedurally defaulted ineffective assistance of counsel claim would not provide cause to excuse a default. <u>Edwards</u>, 529 U.S. at 451-52. Thus, a lesser standard for allowing a petitioner to return to state court to exhaust such a claim in an attempt to establish cause to excuse a procedural default is consistent with both <u>Rhines</u> and <u>Edwards</u>. The Court therefore rejects Petitioner's attempt to equate good cause under <u>Rhines</u> and cause to excuse a procedural default. Because Petitioner has failed to identify or allege that "some objective factor external to the defense impeded counsel's efforts to comply with the rule," he has failed to establish cause sufficient to excuse the default.[11] <u>Murray</u>, 477 U.S. at 488; <u>McCleskey</u>, 499 U.S. at 493-94; <u>Edwards</u>, 529 U.S. at 451-52.

## B.   Prejudice

In order to establish prejudice to overcome a procedural default, Petitioner must show "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." <u>See</u> <u>United States v. Frady</u>, 456 U.S. 152, 170 (1982) (discussing prejudice where defendant failed to object to jury instructions in proceeding under 28 U.S.C. § 2255). "Prejudice [to excuse claims procedurally barred in a habeas case] is actual harm resulting from the alleged error." <u>Vickers v. Stewart</u>, 144 F.3d 613, 617 (9th Cir. 1998).

For deficient performance of counsel to rise to the level of a constitutional violation, Petitioner must demonstrate two things. First, he must show that counsel's performance was deficient. <u>Strickland</u>, 466 U.S. at 687. "This requires showing that counsel made errors so

---

[11] Petitioner states that if the Court finds that he has not established cause to excuse the default because the delay in presenting the claims to the state courts is attributable to Petitioner's federal habeas counsel, he requests the Court to delay issuing this Order until after the Supreme Court reviews <u>Martinez v. Schriro</u>, 623 F.3d 731 (9th Cir. 2010) (holding that ineffective assistance of first post-conviction counsel could not serve as cause to excuse procedural default because petitioner did not have a right to the assistance of counsel in collateral review proceedings even though they constituted the first tier of review for ineffective assistance of counsel claims), <u>cert. granted</u> <u>Martinez v. Ryan</u>, 131 S.Ct. 2960 (2011). (<u>See</u> Pet.'s Reply at 33-34.) This Court need not await that decision because even if Petitioner could establish cause for his failure to properly exhaust the new claims, he is unable to demonstrate prejudice to excuse the default. In addition, Petitioner's first round of state post-conviction review ended in 2001, several years before his federal habeas counsel was appointed in 2003, and as set forth above, the newly exhausted claims should have been presented during the initial round of state post-conviction review.

serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. Second, he must show counsel's deficient performance prejudiced the defense. Id. This requires showing that counsel's errors were so serious they deprived Petitioner "of a fair trial, a trial whose result is reliable." Id. To satisfy the prejudice prong, Petitioner need only demonstrate a reasonable probability that the result of the proceeding would have been different absent the error. Williams v. Taylor, 529 U.S. 362, 406 (2000); Strickland, 466 U.S. at 694. A reasonable probability in this context is "a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. The prejudice inquiry is to be considered in light of the strength of the prosecution's case. Luna v. Cambra, 306 F.3d 954, 966 (9th Cir.), amended, 311 F.3d 928 (9th Cir. 2002).

Petitioner must establish both deficient performance and prejudice in order to establish ineffective assistance of counsel. Strickland. 466 U.S. at 687. "Surmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. __, 130 S.Ct. 1473, 1485 (2010). "The standards created by Strickland and section 2254(d) are both highly deferential [and] difficult to meet" because federal habeas relief under AEDPA functions as a "guard against extreme malfunctions in the state criminal justice systems," and not simply as a means of error correction. Richter, 131 S.Ct. at 788. Rather, "[r]epresentation is constitutionally ineffective only if it 'so undermined the proper functioning of the adversarial process' that the defendant was denied a fair trial." Id. at 791, quoting Strickland, 466 U.S. at 687.

For the following reasons, each of Petitioner's procedurally defaulted allegations of deficient performance of trial counsel, whether considered individually or cumulatively, are without merit and do not provide a basis for finding constitutionally ineffective assistance of counsel. In addition, the new Brady claim is based on speculation and is accordingly without merit. Petitioner therefore cannot demonstrate prejudice to excuse the default.

### 1. Dishonesty of trial counsel

Petitioner's newly exhausted allegations of trial counsel's deficiencies begin with allegations that trial counsel falsely contended during the evidentiary hearing that he had never been: (1) disciplined; (2) accused of not properly representing a client; or (3) accused of fraud.

(Pet.'s P&A at 28.)  Petitioner contends these were lies because trial counsel: (a) was found in contempt of court in June 1999 and fined $1000 for failing to properly represent a juvenile client and failing to respond to a court order; (b) was removed from representing a client by the Ninth Circuit in February 1998 and sanctioned $500 for failing to respond to a court order and failing to communicate with his client; (c) committed fraud when selling his wife's house by covering up termite damage which resulted in an August 2002 civil lawsuit which was eventually settled; and (d) was sued for ineffective assistance of counsel which resulted in a May 1999 arbitration ruling requiring counsel to return 80% of his fee on the basis that trial counsel had failed to get a retainer agreement or substantiate the fee. (Id. at 28-29.) Petitioner contends all these events occurred "about the same time" trial counsel represented him.  As detailed above, trial counsel's representation began around September 1996 and ended when Petitioner was sentenced in October 1999.

Petitioner also contends trial counsel lied at the evidentiary hearing regarding his trial strategy, lied about his interactions with Paula White, and lied when he said he did not know about Douglas and Larose. (Id. at 29-30.)  Petitioner includes a non-exhaustive list of other lies, including trial counsel's claims at the evidentiary hearing that: (1) Tuimalo would not testify at trial; (2) Petitioner told him prior to trial that he did not remember where he was at the time of the murder; and (3) investigator Atwell visited Petitioner in jail. (Id. at 30-31.)

Petitioner has not shown he received an unfair trial because his trial counsel, years after the trial, was accused of fraud in a civil lawsuit regarding termite damage in the sale of his wife's house.  Allegations involving matters occurring after Petitioner's trial do not impact trial counsel's actual representation of Petitioner, and these allegations will not support a finding of deficient performance. See Kimmelman, 477 U.S. at 386 ("It will generally be appropriate for a reviewing court to assess counsel's overall performance throughout the case in order to determine whether the 'identified acts or omissions' overcome the presumption that a counsel rendered reasonable professional assistance.") (emphasis added).  Petitioner contends that counsel's "well documented history of dishonesty and failing to represent his clients" supports a finding that he lied at the evidentiary hearing. (Pet.'s P&A at 3.)  The allegations that trial

counsel lied at the federal evidentiary hearing, which took place five years after the trial, is an attack on counsel's credibility, not his competence. Petitioner is not guaranteed perfect counsel, "only a reasonably competent attorney." Strickland, 466 U.S. at 687. Even accepting Petitioner's contention that counsel's credibility or reputation for honesty impacted his representation, Petitioner has not established, for the following reasons, that counsel's alleged errors worked to "his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." Frady, 456 U.S. at 170.

Petitioner contends trial counsel lied during the federal evidentiary hearing about his trial strategy, claiming that his defense strategy was to impeach the prosecution's two eyewitness, Davis and Tei, who Petitioner contends were teenaged drug addicts, and to call two witnesses, Haley and Tuimalo, who would exonerate Petitioner, but counsel never executed that strategy. (Pet.'s P&A at 10, 30.) Petitioner contends counsel lied when he said that Tuimalo would not testify, and lied when he said that he did not call Haley because she told counsel she had seen Petitioner commit the murder. (Id.) Petitioner contends counsel's reasons for not calling these witnesses are not credible and are unsupported by the record, and that counsel should have at least attempted to introduce their written statements exonerating him. (Id. at 46.)

Trial counsel did in fact impeach Tei and Davis with their robbery convictions, their grants of immunity, the inconsistencies between their trial testimony and their previous statements, as well as their alcohol and drug use, which included calling an expert witness regarding the effects of alcohol and drugs on memories and perceptions. (RT 120-23, 128-35, 141-42, 204-23.) Trial counsel informed the court that he had arranged for Tuimalo to testify, but that she had contacted an attorney who had advised her not to testify and not to get involved. (RT 308.) Haley also refused to testify. (RT 21.) Although Petitioner is correct that no witness placed Haley at the scene of the murder, that by itself does not provide proof that trial counsel lied when he said that Haley said she saw Petitioner murder Atkins. The trial testimony established that Haley was Petitioner's friend and that she left the Seven Gables motel after arguing with Petitioner. It is at least as plausible that Haley went to the Coast Inn, perhaps to prevent Petitioner from killing Atkins, and witnessed the murder, or that she lied to counsel

when she told him she saw Petitioner murder Atkins, or that she assumed Petitioner committed the murder because she knew several people who had witnessed him do so and passed their observations off as her own, as it is that Petitioner's counsel lied when he said the Haley told him she saw Petitioner commit the murder.  Petitioner certainly cannot establish that counsel lied about what Haley said to him about witnessing the murder merely by pointing out that neither Tei nor Davis placed Haley at the scene of the murder.

Petitioner's counsel indicated that he expected Tuimalo to testify that the incident at the Seven Gables motel did not involve Petitioner beating the location of the murder victim out of Williams, that there was no mention of the murder victim's name at the Seven Gables, and that Davis was a chronic liar who may have sold out Petitioner in order to gain favor with a rival gang faction. (CT 38-41.)  Trial counsel indicated that he had to change his trial strategy when Tuimalo changed her mind and refused to testify, and that instead he called a psychiatrist who testified regarding the effects of PCP, alcohol and marijuana on perceptions and memories. (CT 37; RT 316-24.)  Petitioner points out that the prosecutor indicated before trial that his office would be willing to grant Tuimalo immunity if she were to come down and testify.  (RT 26.)  Petitioner argues that trial counsel appeared to forget about the prosecutor's offer when counsel indicated at the beginning of the defense case that the prosecutor was not willing to grant Tuimalo immunity.  (RT 308-09.)

Petitioner speculates that trial counsel may have forgotten to subpoena Tuimalo, and then lied about her unwillingness to testify to cover up his mistake. (Pet.'s P&A at 20.)  However, trial counsel also indicated that Tuimalo had refused to come down to San Diego because she was advised by an attorney not to get involved.  Moreover, the prosecutor may have changed his mind about offering Tuimalo immunity after Tei and Davis had testified, or after trial counsel had proffered Tuimalo's expected testimony in which she denied being present at the murder even though Tei and Davis had placed her there.  (RT 308.)  The record can be read to support such a finding.  After Davis and Tei testified, and after counsel had proffered on the record Tuimalo's expected testimony, the trial judge commented that the District Attorney had a reason not to grant Tuimalo immunity.  (RT 309.)  Petitioner's trial counsel agreed and indicated that

1    such a reason could be based on the statement Tuimalo had made to the defense investigator.

2    (Id.) Petitioner characterizes that exchange as "inscrutable" because in his opinion trial counsel

3    should have allowed the prosecutor to make a record as to whether he was still willing to grant

4    Tuimalo immunity.  (Pet.'s P&A at 20.)  Petitioner's reading of the record, even if plausible,

5    does not establish that counsel lied.

6         Neither has Petitioner provided any support for his contention that trial counsel should

7    have attempted to introduce written statements from Tuimalo or Haley.  There is no indication

8    in the state court record that such statements exist, merely that trial counsel's investigator Atwell

9    had spoken to Haley and Tuimalo and had relayed to trial counsel what they had said.  (CT 36-

10   40.)  Petitioner is correct that trial counsel referred to written statements of Tei and Haley at the

11   evidentiary hearing, but counsel may well have been referring to the oral statements they gave

12   to Atwell who then wrote them down.  (See May 23, 2004 Evidentiary Hearing Tr. at 134-35.)

13   In any case, there is no evidence in the state court record that Tuimalo or Haley executed written

14   statements, merely that they made oral statements to the investigator.  As they both refused to

15   testify based on their Fifth Amendment right, it is likely they also refused to provide written

16   statements.

17        The final allegations of dishonesty of trial counsel involve the alibi witnesses.  Petitioner

18   contends trial counsel lied when he omitted in his initial answers to the Court's interrogatories

19   any mention of potential alibi witnesses Douglas and Larose, but when confronted with his trial

20   file which contained references to those witnesses he admitted he knew about them. (Pet.'s P&A

21   at 30.)  Petitioner contends counsel lied when he told the trial court in the new trial motion that

22   Petitioner had told him that he did not remember where he was at the time of the murder.  (Id.)

23   Finally, Petitioner contends trial counsel claimed at the evidentiary hearing that Paula White told

24   him the first time they spoke that the alibi was false, yet counsel presented White's declaration

25   at the new trial motion, and counsel therefore either lied here or suborned perjury in the state

26   court.  (Id.)  Petitioner's claim that trial counsel was ineffective for failing to investigate the alibi

27   witnesses is discussed below regarding the merits of the Petition, and as set forth in that

28   discussion, they do not provide a basis for demonstrating prejudice under Strickland.

1     In sum, Petitioner has not shown deficient performance or prejudice under <u>Strickland</u>

2  based on allegations regarding trial counsel's honesty.  He has failed to establish prejudice to

3  excuse the default because he has not shown that counsel's alleged errors "worked to his *actual*

4  and substantial disadvantage, infecting his entire trial with error of constitutional dimensions,"

5  or that they caused him "actual harm."  <u>Frady</u>, 456 U.S. at 170; <u>Vickers</u>, 144 F.3d at 617.

6                          **2.  Lack of forensic evidence**

7     Petitioner next alleges that trial counsel failed to recognize that the state's theory of the

8  case was impossible given the lack of forensic evidence.  (Pet.'s P&A at 31.)  Specifically, he

9  argues that the prosecution produced pre-trial discovery indicating that crime scene technicians

10 had thoroughly searched both motels and the car Petitioner drove that night, which he identifies

11 as a Mercury Cougar, but "apparently did not provide discovery indicating any forensic evidence

12 supported its theory of the case, nor did the State provide any notice of its intent to call expert

13 witnesses at trial with respect to fingerprints, blood, DNA, hair, carpet fibers, gun powder

14 residue, et cetera."  (<u>Id.</u> at 32.)  Petitioner contends that because Williams, Tei and Davis all

15 "claimed Williams was subject to a savage, bloody beating," trial counsel "had an inkling that

16 the lack of corroborating forensic evidence was important," but did not point out to the jury that

17 the forensic evidence produced no inculpatory evidence against Petitioner, which "would have

18 been a key step in destroying the State's case." (<u>Id.</u> at 33-34; Pet.'s P&A at 67.)  Petitioner also

19 contends that had trial counsel hired his own forensic expert, the expert could have testified that

20 the crimes could not have happened as the prosecution claimed without corroborating physical

21 evidence.  (Pet.'s Reply at 33.)  Petitioner's federal habeas counsel retained a forensic expert

22 who opined that there should have been inculpatory forensic evidence collected to support what

23 the expert understood to be the prosecution's theory of the case, that Williams was kidnaped and

24 beaten at the Seven Gables motel, was then driven around in the Mercury Cougar and dropped

25 off, that Petitioner then drove the Cougar to the murder scene and shot Atkins, and that Petitioner

26 and the other individuals involved in beating Williams then went to the Motel 6.  (Pet.'s Ex. vol.

27 IVB at 1681.)

28     Petitioner acknowledges that the trial court noted that the prosecution had relied on

1   eyewitness testimony rather than forensic evidence, that there was some physical evidence of

2   assault found at the Seven Gables motel, and that in any case the lack of forensic evidence might

3   have been due to the motel employee's efforts to clean the room before the crime scene was

4   examined and due to the nature of William's injuries.  (Id. at 37-38.)  The trial court also noted

5   that the Deputy District Attorney and a police detective had filed declarations indicating that no

6   exculpatory evidence existed which was not provided to Petitioner, and although some physical

7   evidence had been collected it had not been tested because the prosecution did not think it was

8   relevant to the case.  (Pet.'s P&A Ex. vol. V at 1771.)  Petitioner contends that "a jury would

9   find it hard to believe that claim," or that it is "at least a very disturbing reflection on the good

10  faith nature of the investigation."  (Id. at 34 n.39.)

11      The testimony at trial indicated that Williams was hit on the body with a table leg and

12  hit in the head with a handgun while at the Seven Gables motel, and there was testimony that

13  Williams had blood on his face when the group left the motel.  (RT 82, 88, 101, 171, 186.)

14  There is no evidence in the record that Williams was bleeding profusely as a result of a savage

15  beating which resulted in abundant available forensic evidence as Petitioner speculates.  In fact,

16  Petitioner acknowledges that Williams had only minor injuries when he was interviewed by the

17  police at the crime scene.  (Pet.'s P&A at 9.)  The contention that Williams' injuries were so

18  severe as to leave forensic evidence wherever he went, or that other forensic evidence could

19  have been collected, is based on speculation by Petitioner's federal habeas counsel and his

20  expert, and is not supported by the record.  Speculative and conclusory allegations are

21  insufficient to prove that counsel provided ineffective assistance.  Blackledge v. Allison, 431

22  U.S. 63, 74 (1977); James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994).

23      Neither has Petitioner demonstrated that trial counsel was deficient in failing to argue to

24  the jury that the lack of forensic evidence established that Davis and Tei were lying about the

25  events that evening, or that any prejudice arose from that failure.  Petitioner overstates his case

26  when he argues that "the great weight of the evidence pointed to innocence" and that he was

27  therefore prejudiced by trial counsel's failure to determine whether (or argue that) forensic

28  testing of the evidence was inconsistent with the story told by Tei, Davis and Williams.  (Pet.'s

1   P&A at 37.)  As set forth below, direct eyewitness testimony corroborated by circumstantial

2   evidence was introduced against Petitioner, and his alleged alibi is weak.  Moreover, it is just

3   as easy to speculate that forensic testing might have revealed the presence of Williams' blood

4   at various locations, Petitioner's fingerprints at various locations, gunshot residue on the steering

5   wheel of the car driven by Petitioner, etc., which would have supported the testimony of Tei and

6   Davis.  Petitioner has not shown that counsel's failure to recognize or argue to the jury that the

7   lack of forensic evidence rendered the prosecution's cause impossible was error, much less an

8   error which infected his trial "with error of constitutional dimensions," or caused him "actual

9   harm."  Frady, 456 U.S. at 170; Vickers, 144 F.3d at 617.  Trial counsel's failure to hire a

10  forensic expert was not prejudicial for the same reasons.

11              **3.  Victim Williams**

12          Petitioner alleges that trial counsel failed to recognize that victim Williams' statements

13  were the genesis of the case against him despite the fact that they were implausible, and that a

14  rudimentary investigation by trial counsel would have supported such a conclusion. (Pet.'s P&A

15  at 39.) Petitioner contends that Williams was contacted by police at the scene of the murder, and

16  the first statement he gave did not implicate Petitioner, that Williams did not appear beaten,

17  bloody or shirtless at that time, and that it was only later that he changed his story to implicate

18  Petitioner, his gang rival and drug dealing competitor. (Id.) Petitioner contends that a competent

19  counsel would have presented evidence challenging how Williams ended up at the murder scene

20  if he was supposedly dropped off on the other side of town beaten, bloody and shirtless, and why

21  Williams went to the Coast Inn when he supposedly left his girlfriend's car at the Seven Gables

22  motel. (Id. at 39.) Petitioner also contends that the story Williams gave to the police that he got

23  a ride to the Coast Inn from "some Spanish guy" was implausible because it is incredible that

24  a stranger would give a ride to a bloody, shirtless man at 4:30 in the morning. (Id. at 39-40.)

25          As set forth above, there was no evidence presented at trial that Williams was so severely

26  injured as to leave blood traces wherever he went, merely that he had some blood on his face

27  when he left the Seven Gables motel.  The observations by the police regarding Williams'

28  appearance is consistent with the trial evidence relating to his injuries.  In addition, the evidence

-44-

presented at trial indicated that Williams was dropped off about three miles from the Seven Gables motel and about 1.2 miles from the Coast Inn.  (RT 186-87, 291-92.)  Tei approximated they dropped Williams off about 3:00 a.m.  (RT 183-84.)  The first officer to arrive at the Coast Inn arrived at approximately 4:40 a.m.  (RT 263-64.)  Given the approximate times, Petitioner is merely speculating that Williams could not walk, run, or hitchhike the 1.2 miles to arrive at the Coast Inn in time to speak with the police.

Petitioner contends counsel's lack of investigation into Williams' background prevented counsel from presenting a punishing attack on his credibility.  (Pet.'s P&A at 42.)  Petitioner contends that counsel should have pointed out to the jury why the officers at the murder scene did not notice that Williams gave an inconsistent story that he walked to the scene rather that got a ride from the Spanish guy, failed to notice he was beaten, bloody and shirtless, and should have pointed out to the jury that it was odd Williams went to the Coast Inn rather than to the Seven Gables where he had parked considering that Williams told the police that he did not think Atkins' life was in danger.  (Id. at 9, 39-40.)  Pointing out to the jury that Williams may have rushed to the Coast Inn, which was much closer than the Seven Gables, to warn his friend that Petitioner was on his way to kill him, or to see if Petitioner had already been there and killed him, would not have helped Petitioner's defense.  It may not have surprised the jury to learn that Williams did not immediately implicate Petitioner when speaking to the police, or gave inconsistent accounts of trivial matters, since Williams was the person who had sent Petitioner to the Coast Inn, and the sight of his friend and fellow gang member lying dead might possibly have upset or unnerved Williams.  As Petitioner points out, Williams was a drug-dealing gang member, and he may have been circumspect in his cooperation with the police.  Petitioner has not established that highlighting these facts for the jury, or possibly opening the door for the prosecutor to either make those arguments or introduce evidence that Williams implicated Petitioner which was otherwise excluded by Williams' failure to testify, by attacking the credibility of a witness who did not testify at trial, would have helped his defense.

Petitioner argues that trial counsel failed to introduce photographs showing Williams' injuries, and failed to introduce a photograph which showed that Williams was in fact uninjured.

(Pet. P&A at 39-41.)  Any photographs showing Williams uninjured, and evidence that the police did not notice that Williams was covered in blood, would be consistent with the testimony at trial regarding Williams' injuries, and would have been cumulative to that testimony.

Petitioner alleges that counsel failed to realize Williams had given his statement to the police implicating Petitioner before approaching Tei and Davis, which Petitioner contends is evidence that the police had a script to follow when they questioned Tei and Davis, who then lied to avoid being prosecuted for murder.  (Id. at 40.)  There is no indication in the record that counsel failed to realize Williams had given his statement to the police implicating his attackers before Tei and Davis were contacted.  Such is the natural course of police investigation and the timing was obvious.  Neither has Petitioner supported his contention that trial counsel was unaware of the contents of the police reports or could have more effectively cross-examined Tei and Davis by pointing out they were contacted after Williams made his statement to the police. Petitioner has failed to demonstrate that it was an unreasonable tactical decision for his counsel to avoid highlighting to the jury that Williams had implicated Petitioner or to avoid introduction of incriminating evidence which had been excluded as a result of Williams' failure to testify.

Petitioner contends counsel was deficient in failing to call to the jury's attention the prosecution's decision not to call Williams as a witness.  (Id. at 41.)  The state court record demonstrates that Williams could have directly implicated Petitioner in the kidnaping, assault and false imprisonment charges, could have placed the murder weapon in Petitioner's hand, and could have provided direct evidence that Petitioner had a motive to kill the victim.  This allegation, and the allegation that trial counsel should have attacked Williams' credibility even though he did not testify at trial, are without merit.

Petitioner has not demonstrated an error "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," or that there is a reasonable probability that the result of the proceeding would have been different absent the error. Strickland, 466 U.S. at 689.  Petitioner is not prejudiced by the default because he has not shown that counsel's alleged errors "worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  Frady, 456 U.S. at 170.

1

#### 4.  Defense trial strategy

2        Petitioner alleges trial counsel failed to execute his claimed defense strategy, and failed
3   to perform adequately with the one defense witness he called.  (Pet.'s P&A at 45.)  As set forth
4   above, Petitioner's allegation that trial counsel lied about why he did not execute his trial
5   strategy is without merit.  Petitioner's claim that defense counsel did not execute that strategy
6   is without merit for the same reasons.  Petitioner also contends counsel was told at the
7   preliminary hearing that he would need to retain an expert if he were to introduce evidence about
8   the effects of drugs, but did not contact his expert until two days before trial, and only received
9   a two-paragraph report from the expert on the first day of trial.  (Id. at 48.)  Petitioner contends
10  that trial counsel did not thoroughly prepare or examine the expert at trial, which was revealed
11  when the expert was admitted he was not aware of the term "sherm," which was used by Davis
12  to describe how she smoked PCP.  (Id. at 49.)

13        Petitioner has not demonstrated that he was prejudiced by counsel's failure to prepare his
14  expert witness regarding the meaning of "sherm," or by counsel's examination of the expert.
15  Rather, the record reflects that the expert provided adequate testimony regarding the effect of
16  drugs and alcohol, including PCP, on perceptions and memories, which was the purpose of his
17  testimony.  (RT 316-24.)

18

#### 5.  Inconsistencies in the testimony of Davis and Tei

19        Petitioner contends that trial counsel failed to recognize and point out in closing argument
20  the dozens of inconsistencies in the testimony of Davis and Tei and in their prior statements.
21  (Pet.'s P&A at 50.)  Petitioner states there are about twenty such inconsistencies, and contends
22  trial counsel had to "stretch his memory" at trial to argue to the jury that "more than a few"
23  existed, and that counsel would have been better off allowing the jury to rely on their own
24  memory of these inconsistencies.  (Id. at 16-17, 50.)  Petitioner acknowledges that the trial court
25  concluded that most of these inconsistencies were minor and could be explained by the
26  witnesses' drug and alcohol use, and that the jury might have discounted the inconsistencies
27  based on the expert testimony regarding the effects of drugs and alcohol.  (Id. at 51-52.)

28        As set forth above, trial counsel impeached Davis and Tei with their inconsistent

statements, along with their drug and alcohol use, their convictions, their grants of immunity, and their potential accomplice liability.  Trial counsel argued in his closing remarks that the case against Petitioner depended on their believability, compared the prosecution's decision to call them as witnesses to making a deal with the devil, argued they were accomplices who should not be believed because their testimony was not corroborated, pointed out that their drug use had impaired their memories and perceptions, and pointed out inconsistencies between their trial testimony, their police statements, and their preliminary hearing testimony.  (RT 375-85, 388-89.)  Counsel urged the jury, consistent with their instructions, to rely on their own memories and notes regarding those inconsistencies, and not to rely on counsel's memory.  (RT 385.)  He then argued there was no corroboration of the testimony of Tei and Davis other than each other's testimony, pointed out that Tei gave inconsistent testimony regarding how long it took to get from the Seven Gables to the Coast Inn, and urged the jury not to convict Petitioner based on the reference to his gang affiliation.  (RT 386-91.)

Petitioner has not shown that trial counsel's decision to urge the jury to rely on their own memories and notes in examining the discrepancies in the testimony of Tei and Davis, rather than inventorying those inconsistencies during closing argument, most of which were minor and could be easily explained by their drug and alcohol use, and which had already been pointed out during their testimony, alleges an error "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," or that there is a reasonable probability that the result of the proceeding would have been different absent the error. Strickland, 466 U.S. at 689.  With respect to these allegations, Petitioner has not shown his trial was infected with error of constitutional dimension.  Frady, 456 U.S. at 170.

### 6. Failure to object

Petitioner contends trial counsel should have objected when the prosecutor force-fed testimony to Tei and Davis, and when the prosecutor improperly "refreshed" Tei's and Davis' testimony, by leading the witnesses with police reports to "get them to agree with him" rather than using the reports properly to refresh their memories.  (Pet. P&A at 56-57.)  A review of the transcript reveals that the prosecutor's use of prior statements and prior testimony to refresh the

memories of the witnesses was neither improper nor objectionable, as the prosecutor first asked the witnesses if reviewing the prior statements would refresh their memory, and then showed them the statements only after they answered "yes."  (RT 86, 88, 90, 94-96, 111, 114, 168-70, 175, 181, 193.)  Even in the rare times the prosecutor did not follow this exact form (see RT 92-93, 182, 225-29), Petitioner has not shown that an objection would have changed the responses provided by Tei and Davis, would have prevented the testimony from coming in, or would have made any difference whatsoever.

Petitioner contends trial counsel failed to object when the prosecutor vouched for Tei and Davis in opening statements and once in closing argument, and that the vouching essentially introduced "phantom hearsay."  (Pet.'s P&A at 53.)  Petitioner refers to the statement of the prosecutor during opening that: "We are going to hear from Evangelina Tei, 'Vangie' Tei.  She is going to tell you what happened."  (RT 55.)  The prosecutor also stated: "April Davis tells [the police] what happened.  She tells them everything that happens.  Vangie Tei gives somewhat of a statement.  But it's approximately a month later that she comes back in and gives the main statement telling what she saw that happened."  (RT 58.)

Petitioner contends trial counsel should have "nipped this sort of improper vouching (and essentially phantom hearsay) in the bud" by objecting.  (Pet.'s P&A at 53.)  There was no basis for objecting during opening argument regarding what the prosecutor believed the evidence would show, and there was no vouching or phantom hearsay.  See United States v. McChristian, 47 F.3d 1499, 1506 (9th Cir. 1995) (holding that in order to prove a claim of improper vouching, petitioner must show that the prosecutor placed "the prestige of the government" behind the witness by personally assuring the witness' veracity).  It was for the jury to decide if the witnesses actually "told what happened" or if they "told everything that happened."  Evidence was presented that Tei and Davis made statements to the police which were used at trial to refresh their memories and to impeach their trial testimony.  Even if the witnesses' statements were inaccurate or incomplete, the proper procedure would have been for trial counsel to cross-examine the witnesses during trial, as he did, or point out during closing argument that the prosecutor's promise during opening was not met, not to interrupt opening statements with an

1  improper objection.

2  / / /

3  / / /

4         Petitioner contends counsel should have objected when the prosecutor made the following

5  statements during closing argument:

6         The witnesses who came in here, they weren't angels, but that doesn't mean there
       isn't a crime to pay.  They came in and told you what happened, what they recall.

7         Sometimes they had to have their memory refreshed for something that happened
       three years ago.  Sometimes they were evasive.  But just remember, Evangalina

8         Tei and April Davis gave their statements to the police.  And they were contacted
       on the 16th, early morning hours of the 17th.  And they – they spoke of their

9         actions at the Coast Inn and the Seven Gables.  And she came back a month later
       and gave a statement.  So there were crimes committed.

10

11  (RT 363-64.)

12         Petitioner argues that not only was this was bald-face vouching, no such statements were

13  introduced at trial.  However, evidence was introduced that the witnesses were interviewed by

14  the police and gave statements to the police.  Tei and Davis admitted at trial that they needed to

15  have their recollections refreshed with the police reports.  There was no vouching.

16         Petitioner contends the prosecutor improperly attacked his character in closing argument

17  when he stated:

18         Its clear the defendant participated in the events that took place.  Actually,
       he facilitated and started the events that happened at the Seven Gables hotel.  He

19         also is the one who facilitates and is the main actor regarding the events that
       happened at the Coast Inn.  Nobody else.  Nobody else.  Just because the

20         defendant has a different lifestyle than most people are used to, he is still held at
       the same standard this community has.  [¶]  As a jury, you are the one who forces

21         that standard; that standard the court gave to you, the standard of the law the court
       has given to you.  The defendant must be held to the same standard as everyone

22         else.  The standard that needs to be abided by.  Just because he and some of his
       friends don't think in a scenario normally, they don't abide or they don't have the

23         same principles as others, they are still held to the same standard.

24  (RT 373-74.)

25         The testimony at trial indicated that Petitioner drove several juveniles to the Seven Gables

26  motel where they were drinking or doing drugs, robbing and beating Williams, and that

27  Petitioner himself was armed, robbed and assaulted Williams, held a gun to a juvenile female's

28  head and pulled the trigger multiple times in an attempt to intimidate her into murdering

1    Williams, and then murdered Atkins in cold blood.  There was also evidence introduced that the

2    gang affiliations of Petitioner and the others may have had something to do with the events that

3    night.  Thus, even to the extent the prosecutor's comment was an attack on Petitioner's character,

4    given the evidence introduce at trial, it was a mild one.  Trial counsel's decision not to interrupt

5    the prosecutor's closing argument with an objection which would have needlessly drawn the

6    jury's attention to Petitioner's character would have been a reasonable tactical decision.

7         Petitioner next contends trial counsel should have objected when the prosecutor argued

8    that the motive for the murder was that Atkins had "snitched" on Petitioner, when there was no

9    evidentiary support for that theory.  (Pet.'s P&A at 55.)  Petitioner contends that neither Tei nor

10   Davis testified that Petitioner was looking for Atkins because he thought Atkins had snitched

11   on him, merely that he was looking for Atkins because he wanted to know who had told on him,

12   perhaps by asking Atkins.  (Id.)  Tei testified that Petitioner wanted to know where Dirt,

13   Honeywood and Termite were because Petitioner "was looking for them because he wanted to

14   know who told on him," or, in Petitioner's words, wanted to know who had "snitched" on him.

15   (RT 175-76.)  Davis testified that Petitioner hit Williams in the head with a gun and asked him

16   where Williams' friend "Dirt" was, and Williams told him.  (RT 84-88.)  Davis and Tei both

17   testified that Petitioner then drove to where Williams said Dirt could be found, and almost

18   immediately upon arriving there Petitioner killed Atkins, who went by the nickname Dirt.  (RT

19   101-16, 188-98, 235-38, 266, 285.)  Although Petitioner may be correct that Dirt did not in fact

20   "snitch" on him, or that the testimony of Davis and Tei could reasonably support a finding that

21   he was looking for Atkins to ask Atkins who had informed on him, a reasonable inference could

22   nevertheless be drawn from the testimony of Davis and Tei that Petitioner murdered Atkins

23   because Petitioner thought Atkins had snitched on him.  An objection to the prosecutor's

24   argument would have been overruled and would have only highlighted the motive to the jury.

25   See United States  v. Chastain, 84 F.3d 321, 323 (9th Cir. 1996) (the prosecution is permitted

26   to argue any reasonable inference from the evidence).  Petitioner's allegation that he knows the

27   person who informed on him and it was not Atkins (see Pet. at 8), even if true, did not prevent

28   the prosecutor from asking the jury to draw the inference.

Petitioner next argues that trial counsel should have objected when the prosecutor misstated the law by arguing in closing to the jury that:

> As you sit there and you go back there, there might be some things missing. There might be a few pieces missing from that puzzle. Because there are pieces missing for the puzzle doesn't mean you can't tell what the picture is. Your job is not to speculate what is not there. You job is to concentrate on the evidence that is there.

(RT 363.)

Petitioner contends this nullified a most basic legal proposition that holes in the prosecution's case can and should be considered when determining whether the prosecution has carried its burden of presentation and persuasion. (Pet.'s P&A at 58.) The "gaping holes" Petitioner identifies in the prosecution's case are the failure of Williams to testify and the lack of forensic evidence. (Id.) As discussed above, those are not only easily explained, it was actually to Petitioner's advantage that Williams did not testify, assuming his testimony would have been consistent with the testimony of Tei and Davis, and there is no indication in the record it would not have been. Even if the prosecutor's statement was objectionable, Petitioner has not shown prejudice flowing from counsel's failure to make objections at trial because he has not shown that counsel's alleged error in this regard infected his trial with error of constitutional dimension. Frady, 456 U.S. at 170.

### 7. Failure to file motions

In his final new allegation of deficient performance of trial counsel, Petitioner alleges counsel failed to file any trial motions other than one contesting the sanction leveled against him for his late disclosure of the expert witness. (Pet.'s P&A at 59.) In particular, he contends counsel should have moved to suppress testimony from a detective who found a newspaper article about Atkins' murder under a mattress in the search of Petitioner's mother's home because no foundation was ever laid regarding Petitioner's connection to that room. (Id.) The police officer who conducted the search testified that the search at issue was a "search of the place where Mr. Watson lives," and was "a search of the defendant's room." (RT 289, 293.) Following the evidentiary hearing in this Court, Petitioner provided a declaration from his mother stating that Petitioner was not living in her home at the time the article was found, that

1   she kept the article herself and put it under the bed, and "while people may think it is strange to

2   store newspaper articles under the bed, or between the mattress and the box-spring, that is

3   something I commonly do, as I grew up in the South and we often put things in those places."

4   (Doc. No. 84, Ex. J.) Judge Benitez granted Respondent's motion to strike that declaration from

5   the record, along with about a dozen other declarations submitted by Petitioner in his post-

6   evidentiary hearing brief. (See 11/17/04 Order Denying Petition at 23.) The Ninth Circuit did

7   not preclude this Court from considering the declarations on remand. (Doc. No. 109 at 8.)

8       Even considering the affidavit, Petitioner has not shown that he was prejudiced from the

9   failure to move to suppress the newspaper article because the record is devoid of evidence

10  regarding whether and to what extent his mother could have been impeached and whether there

11  was other evidence that Petitioner occupied or had access to the room. Petitioner has not shown,

12  for example, that had counsel objected to the lack of foundation, a foundation for the question

13  could have been laid based on the same facts which were used to justify the search of the room.

14  There is no showing that counsel's alleged error in this regard infected his trial with error of

15  constitutional dimension, and he has therefore failed to demonstrate prejudice to excuse the

16  default. Frady, 456 U.S. at 170.

17      Petitioner also contends trial counsel did not request any jury instructions, even when

18  asked by the trial court if he wanted a manslaughter instruction, despite the fact that the shooting

19  happened quickly in the early morning hours and involved what the prosecution claimed "were

20  rival gang members with a beef to settle." (Id. at 60.) He also contends counsel did not object

21  to a "defense-adverse jury instruction" given as a result of the late disclosure of the expert which

22  has since been found to be erroneous.[12] (Id. at 21 n.34.)

23      Evidence was presented at trial that Petitioner was looking for Atkins because Petitioner

24  was looking for a snitch, that Petitioner beat Williams for over an hour to discover Atkins'

25  location, that Petitioner went to that location after getting Williams out of the way, and that

---

26

27      [12] The instruction informed the jury in relevant part that: "The weight and significance of any
    delayed disclosure are matters for your consideration. However, you should consider whether the
28  untimely disclosed evidence pertains to a fact of importance, something trivial or subject matter already
    established by other credible evidence." (Pet.'s Ex. Vol. 1 at 167.)

1   Petitioner murdered Atkins almost immediately upon encountering him.  Petitioner has failed

2   to identify any evidence in the record which would support a finding that at the time of the

3   murder "his reason was obscured by passion," as opposed to having acted merely out of revenge

4   or retaliation.  See People v. Sinclair, 64 Cal.App.4th 1012, 1015 (1998) (holding that in order

5   to give a manslaughter instruction there must "be evidence from which it can be inferred that the

6   defendant's reason was in fact obscured by passion at the time of the act."); see also People v.

7   Logan, 175 Cal. 45, 49 (1917) ("For the fundamental of the inquiry [into whether the defendant

8   acted in the heat of passion] is whether or not the defendant's reason was, at the time of his act,

9   so disturbed or obscured by some passion -- not necessarily fear and never, of course, the passion

10   for revenge -- to such an extent as would render ordinary men of average disposition liable to

11   act rashly or without due deliberation and reflection.")  Based on the evidence presented at trial,

12   there was no basis for counsel to request a manslaughter instruction.

13       Petitioner has failed to show that had trial counsel objected to the "defense-adverse"

14   instruction it would not have been given.  Nor has Petitioner shown that any prejudice resulted

15   from the instruction, and has pointed to no error caused by counsel's failure to request any other

16   instruction.  Petitioner has therefore not shown that counsel's alleged failings regarding jury

17   instructions infected his trial with error of constitutional dimension.  Frady, 456 U.S. at 170.

18                    **8. Brady claim**

19       Finally, Petitioner contends in the newly exhausted Brady claim that "it appears highly

20   likely" that the prosecutor failed to turn over forensic evidence testing and evidence regarding

21   victim Williams' injuries.  (Pet.'s P&A at 65.)  He contends that common sense indicates that

22   it seems highly likely that prosecution experts examined the evidence gathered from the Coast

23   Inn, Seven Gables motel, Motel 6, and the Mercury Cougar, and produced forensic evidence

24   testing, but no such materials can be found in trial counsel's file.  (Id.)  He further contends that

25   although Tei, Davis and Williams claimed that Williams was subjected to a savage, bloody

26   beating, there were no photographs in trial counsel's file substantiating that testimony, so it

27   seems likely the prosecution withheld such evidence, and "the lack of such injuries clearly

28   amounts to Brady material, as it strongly undermines Williams's, Tei's, and Davis's claims."

1 | (Id. at 65, 67.)

2 |     As discussed above, the lack of forensic evidence is easily explained and Petitioner is
3 | incorrect that the evidence at trial indicated that Williams sustained injuries which rendered him
4 | bloody to the extent he would have contaminated every place he went with easily collected blood
5 | and tissue samples.  The state court made findings that all relevant evidence had been turned
6 | over to the defense, and Petitioner merely speculates that the lack of forensic evidence involved
7 | bad faith on the part of the prosecution.  (Pet.'s P&A at 34 n.39, 67 n.52.)  This claim is based
8 | on speculation that such evidence exists and was not turned over to the defense, and speculation
9 | that such evidence would be inculpatory if it in fact existed.  Petitioner is unable to demonstrate
10 | that his trial was infected with errors of constitutional dimension on the basis that it seemly
11 | highly likely to him that the prosecution failed to turn over forensic evidence.  Frady, 456 U.S.
12 | at 170; Vickers, 144 F.3d at 617.  Petitioner's discovery request is denied.  See Calderon v.
13 | District Court, 98 F.3d 1102, 1106 (9th Cir. 1996) (holding that "courts should not allow
14 | prisoners to use federal discovery for fishing expeditions to investigate mere speculation.")

15 |     **9.  Conclusion re prejudice**

16 |     Petitioner contends that he has established prejudice under Strickland with respect to the
17 | numerous new allegations of trial counsel's deficient performance, going so far as to argue that
18 | this Court should presume prejudice because "the State's case was very weak, as it was based
19 | on the shaky testimony of two young derelicts with an obvious motive to lie, and whose
20 | testimony was incredible because it parroted Williams' incredible statements, and because of the
21 | lack of any corroborating forensic evidence."  (Pet.'s P&A at 63.)  That weakness, coupled with
22 | the type of evidence trial counsel failed to introduce and the various errors he made, are so
23 | numerous and compelling in Petitioner's estimation that it is impossible for any court to
24 | conclude that Petitioner was not prejudiced, even though of course the state trial court (and
25 | presumably the state appellate court) concluded that the new allegations of deficient performance
26 | did not establish prejudice.

27 |     As set forth above, Petitioner has identified no defect in counsel's performance at trial
28 | which could lead this Court to conclude that he was not acting as the counsel guaranteed by the

Sixth Amendment, or that Petitioner was prejudiced in any manner by the alleged instances of deficient performance. Rather, the evidence at trial indicated that Petitioner murdered a man in cold blood in front of several witnesses after beating the victim's location out of a man he had just kidnaped, robbed and assaulted at gunpoint. Two of the witnesses testified at trial after suffering robbery convictions based on the events that night, and three other participants were convicted of robbery and refused to testify. As discussed below, Petitioner's alleged alibi was so weak he was unable to secure the trial testimony of even one of the five persons he identifies as friends, all five of whom allegedly knew where he was at the time of the murder, and did not object that an alibi had not been presented even though he objected to two other irregularities which he believed rendered his trial unfair. Petitioner has not shown that the errors alleged above, or the speculation that a <u>Brady</u> violation occurred, either individually or cumulatively, infected "his entire trial with error of constitutional dimensions," or that they caused him "actual harm." <u>Frady</u>, 456 U.S. at 170; <u>Vickers</u>, 144 F.3d at 617. He has therefore failed to establish prejudice to excuse the default.

### C. Fundamental Miscarriage of Justice

Finally, Petitioner can avoid a procedural default if he can demonstrate that a fundamental miscarriage of justice would result from the default. The United States Supreme Court has limited the "miscarriage of justice" exception to petitioners who can show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." <u>Schlup v. Delo</u>, 513 U.S. 298, 327 (1995). "Actual innocence" means factual innocence, not legal insufficiency; a mere showing of reasonable doubt is not enough. <u>See Wood v. Hall</u>, 130 F.3d 373, 379 (9th Cir. 1997). In order to establish actual innocence, Petitioner must show that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt. <u>Id.</u>

Petitioner contends he can establish actual innocence by a combination of: (1) Williams' lack of credibility and his presence at the murder scene, which exposes the testimony of Tei and Davis as having been fed to them by the police and regurgitated at trial in order to avoid their own liability for murder; (2) the complete lack of forensic evidence; (3) the alibi which was

never presented; and (4) the lack of evidence to support the revenge motive.  (Pet.'s Reply at 35-36.)  As set forth above, these new allegations are without merit and have no relation whatsoever to factual innocence.  And as discussed below, the alibi claim is weak, and it would at best merely present a challenge to the veracity of the eyewitnesses.  Thus, Petitioner has failed to demonstrate his factual innocence.

### D.    Conclusion

The Court finds that Petitioner's newly exhausted claims are procedurally defaulted and that Petitioner has not established cause, prejudice or the existence of a fundamental miscarriage of justice sufficient to excuse the default.  Moreover, even if Petitioner could made such a showing, it is clear that the newly exhausted claims do not establish, either individually or cumulatively, that Petitioner received constitutionally ineffective assistance of trial counsel, or that the prosecution withheld exculpatory evidence.  As such, for the reasons discussed in the prejudice section above, the Court would deny habeas relief were it to reach the merits of the procedurally defaulted claims.

### V.    Statute of Limitations

Respondent contends that the one-year statute of limitations bars relief as to the newly exhausted claims because they were not presented in an amended petition prior to the expiration of the limitations period, and do not relate back to the original, timely filed Petition.  (Resp.'s Opp. at 9-15.)  Petitioner argues that the one-year statute of limitations began to run when he discovered the factual predicate of the more serious instances of deficient performance in late 2003 and early 2004 when preparing for the evidentiary hearing, and that he timely raised those claims in his post-evidentiary hearing brief filed in 2004.  (Pet.'s Reply at 39-40.)  He argues that in any case the claims relate back to the claims presented in the timely filed original Petition.  (Id. at 40-41.)

For the following reasons, the Court finds that the new allegations of deficient performance regarding the alibi defense, including the two new alibi witnesses, relate back to the original timely Petition and are not barred by the statute of limitations.  The remaining new allegations of deficient performance do not relate back to the original Petition.  In addition, the

1 factual predicate of the remaining new allegations, except that counsel lied at the evidentiary

2 hearing, as well as the new Brady claim, were apparent from the trial record, and are not timely

3 because they were not raised in, and do not relate back to, the original Petition.

**A.      Triggering Dates of the Limitations Period**

5   The one-year statute of limitations applicable to federal habeas petitions pursuant to 28

6 U.S.C. § 2254 begins to run at the latest of—

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

16 28 U.S.C.A. § 2244(d)(1)(A)-(D) (West 2006).

17   The original Petition in this case was constructively filed on September 27, 2001, the date

18 Petitioner indicates he handed it to the prison officials for filing.  (Doc. No. 1 at 46); Anthony

19 v. Cambra, 236 F.3d 568, 574-75 (9th Cir. 2000).  Petitioner's conviction became final on

20 December 18, 2001, the last day he could have filed a petition for a writ of certiorari in the

21 United States Supreme Court.  (See Answer [Doc. No. 30] at 2-3; Resp.'s Lodgments [Doc. No.

22 12] E-G); Bowen v. Roe, 188 F.3d 1157, 1159 (9th Cir. 2002).  The statute of limitations began

23 to run under § 2244(d)(1)(A) the next day, December 19, 2001.  Patterson v. Stewart, 251 F.3d

24 1243, 1246 (9th Cir. 2001).  Petitioner's initial round of state post-conviction relief also ended

25 on December 19, 2001, when the California Supreme Court summarily denied relief (see Answer

26 at 3), providing one day of statutory tolling.  Bunney v. Mitchell, 262 F.3d 973, 974 (9th Cir.

27 2001).  Thus, to the extent the one-year statute of limitations was triggered by the conclusion of

28 direct review under § 2244(d)(1)(A), it expired on December 20, 2002, and the Petition, filed

1   on September 27, 2001, is timely.

2       Petitioner argues that the one-year limitations period began to run for the new claims

3   under § 2244(d)(1)(D) when he discovered the factual predicate for these claims while reviewing

4   trial counsel's file in late August 2003. (Pet.'s Reply at 30, 39.)  He contends that once the

5   Ninth Circuit held (on September 13, 2006) that the new facts and claims would not be

6   considered until they were exhausted, he promptly (on February 7, 2007) notified this Court

7   during a status conference that he intended to seek stay and abeyance, promptly (on June 8,

8   2007) took the claims back to state court, and formally filed a motion for stay of this action on

9   January 28, 2008 after it became clear his informal request would not be ruled upon. (Id. at 38;

10  see also Doc. No. 113 at 2-3.)  As discussed above in the procedural default section, the state

11  supreme court found the new claims to be untimely, and the state trial court found they "were

12  evident from the trial transcript and should have been challenged on appeal." (Pet.'s Ex. V at

13  1770-71.)  Petitioner admits some of the new allegations of deficient performance were evident

14  from the trial record, but contends they are "less serious" than the instances discovered in

15  preparation for the evidentiary hearing, and are only included because they reveal that trial

16  counsel "effectively did nothing to represent [Petitioner], other than show up for trial." (Pet.'s

17  Reply at 20 n.16; see also id. at 21, citing Kimmelman, 477 U.S. at 386.)

18      As for the instances of deficient performance which Petitioner admits were evident from

19  the trial record, the statute of limitations clearly expired in 2002, and they are untimely because,

20  as discussed below, they do not relate back to the original Petition and the limitations period was

21  not tolled.  Petitioner identifies the other, more compelling allegations of deficient performance

22  as counsel's failure to: (1) deal with the lack of forensic evidence; (2) expose kidnap victim

23  Williams as a liar and possibly responsible for the murder, and; (3) execute the claimed defense

24  strategy. (Pet.'s Reply at 30.)  As set forth below, it is clear that, with the exception of the

25  claims that trial counsel lied at the 2004 evidentiary hearing, all of the new claims "could have

26  been discovered through the exercise of due diligence" at trial, and § 2244(d)(1)(D) does not

27  apply.  Thus, the limitations period as to Petitioner's new claims (other than that trial counsel

28  lied at the evidentiary hearing) expired in December 2002, and they are untimely even if the

Petition is considered amended as of June 2004, the date Petitioner first brought the claims to the attention of the Court, unless they: (1) relate back to the filing of the original Petition; or (2) the limitations period was tolled.

### B.     The Limitations Period was not Tolled

The statute of limitations is tolled while a "properly filed" habeas petition is "pending" in state court.  28 U.S.C. § 2244(d)(2).  Because Petitioner did not begin to exhaust his state court remedies as to the new claims until 2007, over six years after his first full round of state post-conviction relief ended at the conclusion of direct review, statutory tolling is not available. Jiminez v. Rice, 276 F.3d 478, 482 (9th Cir. 2001) (holding that state post-conviction petition which was filed after expiration of the statute of limitations cannot toll the limitations period). In any case, the exhaustion petition was denied by the state supreme court as untimely, precluding statutory tolling.  See DiGuglielmo, 544 U.S. at 413-14 (holding that denial of petition by California Supreme Court as untimely precludes statutory tolling).

The statute of limitations is also subject to equitable tolling.  Holland v. Florida, 560 U.S. ___, 130 S.Ct. 2549, 2560-63 (2010).  However, a petitioner must show: "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing."  Id. at 2562.  Petitioner bears the burden of showing "extraordinary circumstances" were the proximate cause of his untimeliness, rather than merely a lack of diligence on his part.  Spitsyn v. Moore, 345 F.3d 796, 799 (9th Cir. 2003).

There is no basis apparent in the record, and the parties have argued none, which would support equitable tolling, other than perhaps Petitioner's assertion that many of the more serious incidents of deficient performance were not discovered until his trial counsel's file was reviewed.  Petitioner contends that he repeatedly and unsuccessfully attempted to obtain the file, which was not turned over until late August 2003 after Petitioner's appointed federal habeas counsel threatened to file a complaint with the state bar association if trial counsel did not oblige. (Pet.'s Reply at 30.)  The Court need not develop the record in this regard, however, because, as set forth immediately below, the factual predicate of the new claims could have been discovered at the time of trial without review of trial counsel's file.

1

### C.    Relation Back

2          Federal Rule of Civil Procedure 15(c) provides that "An amendment of a pleading relates

3   back to the date of the original pleading when: . . . the amendment asserts a claim or defense

4   that arose out of the conduct, transaction, or occurrence set out–or attempted to be set out–in the

5   original pleading." Fed.R.Civ.P. 15(c). In Mayle v. Felix, 545 U.S. 644 (2005), the Supreme

6   Court addressed, in the context of a habeas petitioner attempting to amend a petition with a claim

7   which would otherwise be untimely under AEDPA's one-year statute of limitations, the meaning

8   of Rule 15(c)'s phrase "conduct, transaction, or occurrence." Id. at 656. The Court rejected a

9   broad reading of that phrase, noting that: "If claims asserted after the one-year period could be

10  revived simply because they relate to the same trial, conviction, or sentence as a timely filed

11  claim, AEDPA's limitations period would have slim significance." Id. at 662. Rather, the Court

12  held that because Rule 2(c) of the rules following 28 U.S.C. § 2254 requires a petitioner to

13  "specify all (available) grounds for relief," and to "state the facts supporting each ground," each

14  separate category of facts supporting the grounds for relief constitutes a "conduct, transaction,

15  or occurrence." Id. at 661. The Court concluded that: "So long as the original and amended

16  petitions state claims that are tied to a common core of operative facts, relation back will be in

17  order." Id. at 664. New claims do not relate back if they assert "a new ground for relief

18  supported by facts that differ in both time and type from those the original pleading set forth."

19  Id. at 650. These provisions must be strictly construed to further "Congress' decision to expedite

20  collateral attacks by placing stringent time restrictions on (them)." Id. at 657.

21          Mayle "requires a comparison of a petitioner's new claims to the properly exhausted

22  claims left pending in" the original petition. King v. Ryan, 564 F.3d 1133, 1142 (9th Cir. 2009).

23  New allegations of ineffective assistance of counsel do not automatically relate back to a timely

24  claim of ineffective assistance; they must depend on the existence of a common core of operative

25  facts. See e.g. United States v. Marulanda, 226 Fed.Appx. 709, 711 (9th Cir. 2007) (unpublished

26  memorandum) (holding that claim alleging counsel rendered ineffective assistance by referring

27  to his previous trial did not relate back to claims alleging counsel rendered ineffective assistance

28

1    by insulting the judge and failing to object at trial);[13] <u>United States v. Gonzalez</u>, 592 F.3d 675,

2    679-680 (5th Cir. 2009) (holding that claim alleging counsel was ineffective for failing to appeal

3    sentence did not relate back to claim that counsel was ineffective for forcing defendant to

4    proceed to trial and for committing errors in the sentencing phase); <u>United States v. Hernandez</u>,

5    436 F.3d 851, 857 (8th Cir. 2006) (holding that ineffective assistance of counsel claim alleging

6    counsel inadequately cross-examined two witnesses did not relate back to claim of ineffective

7    assistance for failure to object to the admission of evidence on the basis of improper foundation);

8    <u>United States v. Ciampi</u>, 419 F.3d 20, 23-24 (1st Cir. 2005) (finding that allegation that counsel

9    failed to explain consequences of waiver did not relate back to claim that counsel failed to

10   investigate misrepresentations in the indictment).

11       The original Petition contains four claims, alleging: (1) there was insufficient evidence

12   to support the convictions because the only evidence came from two unreliable witnesses;

13   (2) ineffective assistance of trial counsel due to counsel's failure to investigate and interview

14   potential alibi witnesses White, Yard and Morgan; (3) prosecutorial misconduct in presenting

15   a false motive; and (4) ineffective assistance of appellate counsel for failing to raise the

16   prosecutorial misconduct claim on direct appeal. (Pet. at 6-9.) In addition, two claims presented

17   in the Traverse have been treated as if they had been raised in the Petition: (1) ineffective

18   assistance of counsel for failing to cross-examine prosecution witness Hammer regarding an

19   immunity agreement he was allegedly offered; and (2) a <u>Brady</u> claim alleging the prosecutor

20   failed to disclose the immunity agreement allegedly offered to Hammer.  (<u>See</u> 11/17/04 Order

21   Denying Petition [Doc. No. 93] at 30, 32, citing Traverse at 5, 7, 11.)

22       As detailed above, the newly exhausted claims include:  (1) a <u>Brady</u> claim alleging that

23   "it appears highly likely" that the prosecution withheld forensic evidence and evidence regarding

24   kidnap victim Williams' injuries; and (2) an ineffective assistance of trial counsel claim alleging

25   trial counsel: (a) has a history of dishonesty and failing to properly represent clients, including

26   lying at the federal  evidentiary hearing; (b) failed to recognize that the prosecution's theory of

27

28       [13]  Unpublished Ninth Circuit decisions may be cited commencing with decisions issued in
     2007.  (<u>See</u> Ninth Cir. Rule 36-3.)  Although still not binding precedent, unpublished decisions have
     persuasive value and indicate how the Ninth Circuit applies binding authority.

the case was impossible given the lack of forensic evidence; (c) failed to recognize that victim Williams' incredible statements were the genesis of the case against Petitioner, and failed to conduct a rudimentary investigation into Williams' credibility which would have showed that his account was implausible; (d) failed to execute his claimed defense strategy or perform adequately with the only defense witness called; (e) failed to impeach the two main prosecution witnesses with prior inconsistent statements; (f) failed to object to blatantly objectionable actions by the prosecutor; and (g) failed to file any trial motions other than one contesting a sanction leveled against him.  (Pet.'s P&A at 28-61, 64-68.)

For the following reasons, it is clear that the vast majority of the new allegations of deficient performance of counsel, as well as the new <u>Brady</u> claim, do not share a common core of operative facts with, and are not the same time and type as, the claims in the original Petition and Traverse.  Only the allegations regarding the alibi relate back to the allegations in the original Petition and Traverse.  It is also clear that all the new allegations, except those alleging that trial counsel lied at the evidentiary hearing, could have been discovered at the time of trial.

### 1.  Dishonesty of trial counsel

As detailed above in the procedural default section, Petitioner alleges counsel falsely contended during the federal evidentiary hearing that he had never been: (1) disciplined; (2) accused of not properly representing a client; or (3) accused of fraud.  (Pet.'s P&A at 28.) Petitioner contends counsel lied about his trial strategy, and either lied to this Court or the state court regarding whether White would provide Petitioner with an alibi.  (<u>Id.</u> at 29-30.)  The only deficiencies of trial counsel identified in the Petition are counsel's failure to investigate alibi witnesses White, Yard, Morgan and Hammer (<u>see</u> Pet. at 7), although it is clear that Hammer is not an alibi witness.  In addition, Petitioner raised a claim in the Traverse regarding counsel's failure to cross-examine Hammer with respect to the immunity agreement he was allegedly offered by the prosecution.  (<u>See</u> 11/17/04 Order Denying Petition at 30.)

Allegations regarding misdeeds of trial counsel which are unrelated to Petitioner's representation clearly do not relate back to the claims in the Petition or Traverse.  Neither are they timely under § 2244(d)(1)(D) because Petitioner could have discovered the factual predicate

for these claims prior to raising them for the first time in his June 16, 2004, post-evidentiary hearing brief, and certainly prior to the January 28, 2008 amendment of the Petition.  As to the allegations that trial counsel lied at the evidentiary hearing or in his answers to interrogatories, these allegations obviously arose at or around the time of the evidentiary hearing in early 2004. As set forth above, the Petition was not amended to include these claims until January 28, 2008. Thus, even if the factual predicate of these claims arose in 2004, they were not properly presented to this Court until 2008, and they are untimely.

The only allegations which even arguably share a common core of operable facts with the allegations in the original Petition are the allegations that trial counsel lied when he told different versions of whether White would provide Petitioner with an alibi, lied about when he became aware of Douglas and Larose, and lied when he claimed in state court that Petitioner told him before trial that he did not remember where he was at the time of the murder.  (See Pet.'s P&A at 29-31.)  The allegations regarding the alibi defense share a common core of operative facts with, and are the same time and type as, the allegations in the Petition that counsel did not adequately investigate the alibi provided by White, Yard and Morgan.  They are not barred by the statute of limitations because they relate back to the allegations in the original, timely Petition. See Fed.R.Civ.P. 15(c); Felix, 545 U.S. at 664.  All the other allegations regarding trial counsel's dishonesty do not relate back and are untimely.

### 2. Lack of forensic evidence

Petitioner next alleges trial counsel failed to recognize that the state's theory of the case was impossible given the lack of forensic evidence. (Pet.'s P&A at 31.)  He argues that trial counsel "had an inkling that the lack of corroborating forensic evidence was important," but did not point out to the jury that the forensic evidence produced no inculpatory evidence, which "would have been a key step in destroying the State's case."  (Id. at 33-34.)  Petitioner also contends that had trial counsel hired his own forensic expert, the expert could have testified that the crimes could not have happened as the prosecution claimed or else there would have been corroborating physical evidence.  (Id. at 33.)  Petitioner contends this claim shares a common core of operative facts with his claim that the prosecutor knowingly presented false evidence

regarding Petitioner's motive for killing Atkins.  (Pet.'s Reply at 37-41.)

Trial counsel's failure to point out to the jury that the prosecution was unable or unwilling to present forensic evidence of Petitioner's guilt at trial does not share a common core of operative facts with, and is not the same time and type as, the allegations in the original Petition that the prosecutor presented a false theory that Petitioner killed Atkins in revenge for Atkins having informed on him.  The basis for the Petition claim was that Petitioner knew who had informed on him, a person named Carl Banks, and that the testimony of Davis and Tei at best supported a finding that he was looking for Atkins to find out who had snitched on him, not that he actually believed Atkins was a snitch.  (See Pet. at 8.)  The new allegation that trial counsel failed to point out the lack of forensic evidence to the jury does not relate back to the original claim alleging the prosecutor presented a false motive.

There is a claim in the original Petition alleging "there was absolutely no physical evidence as a nexus to correlate petitioner to the alleged conduct, there were no fingerprints, no gun residue tests, no blood, no weapon, no witnesses whom were not benefitting from testifying against petitioner."  (Id. at 6.)  That claim was predicated on the unreliability of eyewitnesses Tei and Davis, and alleged that because they were both accomplices and their testimony was not corroborated there was insufficient evidence to support the convictions.  (Id.)  Allegations that trial counsel failed to point out to the jury that there was a lack of forensic evidence admitted at trial is not the same time and type as, and does not share a common core of operative facts with, an allegation that because the testimony of Davis and Tei was unsupported by forensic evidence the convictions were based on insufficient evidence.

Neither can allegations that trial counsel failed to realize the lack of forensic evidence was important be considered timely under 28 U.S.C. § 2244(d)(1)(D).  Petitioner could have discovered the factual predicate of such a claim at or before trial when the prosecution did not present or turn over forensic evidence and trial counsel did not point out that failure during trial. Even to the extent Petitioner contends he could not have discovered the factual predicate of this claim until he viewed trial counsel's file in 2003 and saw that it did not contain any discovery regarding forensic evidence, the Petition was not amended until 2008.

### 3. Victim Williams

Petitioner next alleges that trial counsel "never highlighted, apparently because he was unaware, that Williams's statements were the genesis of the case" against him despite the fact that they were implausible, and that a rudimentary investigation by trial counsel would have supported such a conclusion. (Pet.'s P&A at 39.) Petitioner contends that a competent trial counsel would have presented evidence challenging: (1) how Williams ended up at the murder scene if he was supposedly dropped off by Petitioner on the other side of town beaten, bloody and shirtless; (2) Williams's story that he got a ride from "some Spanish guy," because it is unlikely that a stranger would give a ride to a bloody, shirtless man; (3) why the officers at the murder scene did not notice that Williams gave an inconsistent story that he walked to the scene from the Coast Inn rather that got a ride from the Spanish guy, and failed to notice he was beaten, bloody and shirtless; and (4) why Williams went to the Coast Inn when he supposedly left his girlfriend's car at the Seven Gables. (Id. at 39-40.) In sum, Petitioner contends counsel should have recognized and pointed out to the jury that Williams was a drug-dealing felon who may have killed Atkins to protect his drug-dealing turf, and that he implicated Petitioner because Petitioner was a rival drug dealer and rival gang member. (Id. at 42.)

Petitioner contends these new allegations relate back in a general sense to the allegations in the Petition, which he argues can be read as presenting a claim that counsel failed "to do anything, even the most obvious and essential things, to represent Mr. Watson." (Pet.'s Reply at 40.) None of the new allegations regarding counsel's failure to challenge the story Williams told to the police or his veracity share a common core of operative facts with any allegation in the original Petition or Traverse, which focused on insufficiency of the evidence, ineffective assistance of trial counsel for failing to cross-examine Hammer and interview White, Yard and Morgan, prosecutorial misconduct in knowingly presenting a false alibi theory and failing to disclose an immunity agreement with Hammer, and deficient performance of appellate counsel in failing to raise the prosecutorial misconduct claim. Neither can Petitioner plausibly argue that these new allegations are timely under 28 U.S.C. § 2244(d)(1)(D), because it is clear the factual predicate of the allegation that trial counsel failed to make these realizations or arguments at trial

1    could have been discovered at the time of trial.

2                    **4. Defense trial strategy**

3             Petitioner next alleges trial counsel failed to execute his claimed defense strategy or

4    perform adequately with the one defense witness he called. (Pet.'s P&A at 45.) Petitioner states

5    that his trial counsel indicated during the evidentiary hearing in this Court that his trial strategy

6    was to exonerate Petitioner and discredit Davis and Tei through the written statements given to

7    the defense by Tuimalo and Haley.  (Id. at 45-46.)  Petitioner contends that trial counsel's

8    claimed reason that he did not execute this strategy (because both witnesses refused to testify

9    and Haley told counsel that she saw Petitioner commit the murder), was not credible and was

10   unsupported by the record, and that counsel should have at least attempted to introduce their

11   written statements exonerating Petitioner.  (Id. at 46.)

12            These allegations do not share a common core of operative facts with the allegations of

13   deficient performance contained in the original Petition and Traverse, which concerned trial

14   counsel's failure to develop an alibi defense and cross-examine Hammer.  Petitioner's trial

15   counsel stated on the record during trial that he intended to call Tuimalo to discredit Davis and

16   to give an alternate scenario as to what had happened at the Seven Gables motel but she refused

17   to testify, and that he expected Tuimalo to testify that Davis was not a believable witness, that

18   Williams came by on his own merely by chance, was beaten due to his having stalked and

19   terrorized Tuimalo and her friends, and was dropped off to get rid of him but without any

20   mention of Atkins. (CT 21, 38-41.)  Petitioner could therefore have discovered at the time of

21   trial the factual basis of the claim that trial counsel did not execute his trial strategy.  The same

22   is true regarding his allegations that trial counsel did not adequately prepare or examine his

23   expert witness.  To the extent Petitioner contends he could not have discovered the factual

24   predicate for the allegations that trial counsel lied during the evidentiary hearing regarding his

25   trial strategy until the evidentiary hearing in 2004, or could not have discovered the actual trial

26   strategy until he viewed trial counsel's file in 2003, those allegations are untimely even under

27   28 U.S.C. § 2244(d)(1)(D) because Petitioner did not amend his Petition until 2008.

28                    **5. Inconsistencies in Davis and Tei's testimony**

                                              -67-

1    Petitioner contends that trial counsel failed to recognize and point out in closing argument
2    the dozens of inconsistencies in Davis and Tei's testimony and in their prior statements.  (Pet.'s
3    P&A at 50.)  He points to about twenty such inconsistencies, and contends trial counsel had to
4    "stretch his memory" at trial to argue to the jury that "more than a few" existed, and would have
5    been better off allowing the jury to rely on their own memory of these inconsistencies.  (Id.)
6    Again, these allegations do not share a common core of operative facts with any allegations in
7    the original Petition, and their factual predicate is obvious from the trial transcript.

8              **6.  Failure to object**

9    Petitioner contends that trial counsel rarely objected at trial, and failed to object to
10   blatantly objectionable actions by the prosecutor.  (Pet.'s P&A at 52-59.)  As detailed above,
11   Petitioner contends the prosecutor vouched for Tei and Davis, introduced phantom hearsay,
12   improperly attacked Petitioner's character, argued a false motive for the murder, force-fed
13   testimony to Tei and Davis, and misstated the law.  (Id.)  Petitioner admits the factual predicate
14   for these allegations is apparent from the trial record.  (Pet.'s Reply at 20 n.14.)

15   None of these allegations relate back to the claims presented in the original Petition, and
16   they are therefore untimely, with the possible exception of the claim that counsel should have
17   objected to the prosecutor's argument during closing that the motive for the murder was that
18   Petitioner thought Atkins had snitched on him.  Even if this allegation might be found to relate
19   back to the allegations in the Petition that the prosecution presented a false motive to the jury,
20   the claim is procedurally defaulted and facially without merit because, as discussed in the
21   procedural default section, the prosecutor was permitted to argue reasonable inferences from the
22   evidence, and both Davis and Tei testified that Petitioner was looking for Atkins because
23   Petitioner wanted to find a snitch.

24            **7.  Failure to file motions**

25   In his final new allegation of deficient performance of trial counsel, Petitioner alleges
26   counsel failed to file any trial motions other than one contesting the sanction leveled against him
27   for his late disclosure of the expert witness.  (Pet.'s P&A at 59.)  He contends counsel should
28   have moved to suppress testimony from a detective who found a newspaper article about Atkins'

1   murder under a mattress in the search of Petitioner's mother's home because no foundation was

2   ever laid regarding Petitioner's connection to that room.  (Id.)  Petitioner also contends counsel

3   did not request any jury instructions, even when asked by the trial court if he wanted a

4   manslaughter instruction.  (Id. at 60.)

5       Petitioner admits the factual predicate for these allegations is apparent from the trial

6   record.  (Pet.'s Reply at 20 n.14.)  Because these allegations do not relate back to the claims

7   presented in the original Petition or Traverse, and their factual predicate is obvious from the trial

8   record, they are untimely.

9                   **8.  Brady claim**

10      Finally, Petitioner contends in the newly exhausted Brady claim that "it appears highly

11  likely" that the prosecutor failed to turn over forensic evidence testing and evidence regarding

12  victim Williams' injuries.  (Pet.'s P&A at 65.)  Petitioner contends that common sense indicates

13  that it seems highly likely that prosecution experts examined forensic evidence gathered from

14  the Coast Inn, Seven Gables motel, Motel 6 and the Mercury Cougar, but no such materials can

15  be found in trial counsel's file.  (Id.)  He further contends that although Williams, Tei and Davis

16  "claimed Williams was subject[ed] to a savage, bloody beating," there were no photographs in

17  trial counsel's file substantiating that testimony.  (Id. at 67.)  Petitioner argues that it therefore

18  seems likely the prosecution withheld evidence of the lack of such injuries, and that "the lack

19  of such injuries clearly amounts to Brady material, as it strongly undermines Williams's, Tei's,

20  and Davis's claims."  (Id. at 65, 67.)

21      Petitioner contends this claim shares a common core of operative facts with his claim that

22  the prosecutor knowingly presented false evidence regarding Petitioner's motive for killing

23  Atkins.  (Pet.'s Reply at 40-41.)  However, there were no allegations in the original Petition or

24  Traverse regarding the lack of forensic evidence other than the reference in the insufficiency of

25  the evidence claim that "there was absolutely no physical evidence as a nexus to correlate

26  petitioner to the alleged conduct, there were no fingerprints, no gun residue tests, no blood, no

27  weapon, no witnesses whom were not benefitting from testifying against petitioner."  (Pet. at 6.)

28  The new claim that it seems likely the prosecutor failed to disclose such evidence does not share

a common core of operative facts with, and is not the same time and type as, a claim alleging there is <u>insufficient evidence to support the convictions</u> because the eyewitness testimony was not corroborated by forensic evidence.  In addition, these allegations are not timely under 28 U.S.C. § 2244(d)(1)(D) because the factual predicate could have been discovered at the time of trial.  Even to the extent Petitioner contends he was unable to discover that trial counsel's file did not contain discovery regarding forensic evidence until he viewed the file, which trial counsel turned over in 2003, the Petition was not amended to include this claim until 2008, and it is therefore untimely.

### D.      Conclusion

As outlined above, the one-year statute of limitations for Petitioner's newly exhausted claims, other than the allegations that trial counsel lied at the evidentiary hearing, expired on December 20, 2002.  The new claims were identified for the first time in this Court in Petitioner's post-evidentiary hearing brief filed a year and a half later on June 16, 2004.  That brief contained a procedurally improper request to amend the Petition, and the Petition was not actually amended to include the new claims until January 28, 2008.  In addition, the majority of the newly exhausted allegations of deficient performance do not relate back to the claims presented in the original Petition and Traverse, with the exception of the new allegations regarding development of the alibi defense.  However, even if the new allegations regarding forensic evidence relate back, they are procedurally defaulted and without merit.  Finally, although the factual predicate of the allegations that trial counsel lied at the evidentiary hearing could only have been discovered at the time of the evidentiary hearing, the Petition was not amended to include those allegations until well after expiration of the statute of limitations.  The Court therefore finds that the newly exhausted claims, except those related to the alibi defense, are barred by the statute of limitations.

### VI.     Merits of the Petition

The final issue to address in this action is the effect the intervening Supreme Court decisions in <u>Pinholster</u> and <u>Richter</u> have on the Ninth Circuit's directions on remand, and on the remaining claim in this action alleging ineffective assistance of counsel for failure to investigate

and interview alibi witnesses. Both parties to this action agree that <u>Pinholster</u> abrogates the need for further development of the record irrespective of the Ninth Circuit's remand instructions, and Petitioner separately argues that <u>Pinholster</u> precludes reliance on the evidence already developed at the evidentiary hearing. (Resp.'s Opp. at 17; Pet.'s Reply at 10-13.)

For the following reasons, it is clear that <u>Pinholster</u> precludes further development of the record irrespective of the Ninth Circuit's instructions on remand. It is also clear that <u>Pinholster</u> requires the Court to reexamine the previous denial of habeas relief with respect to the alibi aspect of the ineffective assistance of counsel claim because that claim was denied based on the evidence developed at the federal evidentiary hearing. The Court must reexamine that claim based solely on the state court record and apply the new standard of review set forth in <u>Richter</u>. Before turning to those issues, the Court will first address Petitioner's contention that the law of the case doctrine requires issuance of the writ based on the finding by Judge Benitez that the evidence presented to the state courts made out a *prima facie* claim of ineffective assistance of counsel. (Pet.'s Reply at 13-14.)

### A. Law of the Case Doctrine

The law of the case doctrine precludes a court "from reconsidering an issue previously decided by the same court, or a higher court in the identical case." <u>United States v. Lummi Indian Tribe</u>, 235 F.3d 443, 452 (9th Cir. 2000). This doctrine is discretionary, not mandatory, but "the prior decision should be followed unless: '(1) the decision is clearly erroneous and its enforcement would work a manifest injustice, (2) intervening controlling authority makes reconsideration appropriate, or (3) substantially different evidence was adduced at a subsequent trial.'" <u>In re Rainbow Magazine</u>, 77 F.3d 278, 281 (9th Cir. 1996), quoting <u>Heglar v. Borg</u>, 50 F.3d 1472, 1475 (9th Cir. 1995).

28 U.S.C. § 2254(d), as amended by AEDPA, provides that:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as

1    determined by the Supreme Court of the United States; or

2           (2) resulted in a decision that was based on an unreasonable
     determination of the facts in light of the evidence presented in the
3    State court proceeding.

4    28 U.S.C.A. § 2254(d) (West 2006).

5        In addition, 28 U.S.C. § 2254(e) provides:

6           (e)(1) In a proceeding instituted by an application for a writ of habeas
     corpus by a person in custody pursuant to the judgment of a State Court, a
7    determination of a factual issue made by a State court shall be presumed to be
     correct.  The applicant shall have the burden of rebutting the presumption of
8    correctness by clear and convincing evidence.

9           (2)  If the applicant has failed to develop the factual basis of a claim in
     State court proceedings, the court shall not hold an evidentiary hearing on the
10   claim unless the applicant [satisfies conditions not relevant here].

11   28 U.S.C. § 2254(e)(1)-(2) (West 2006).

12       Judge Benitez found that a hearing was not precluded by 28 U.S.C. § 2254(e)(2) because

13   Petitioner had been diligent in attempting to develop the factual basis of his claim in the state

14   court, in that Petitioner "*did* present *affidavits to the state courts* making out a *prima facie* claim

15   of ineffective assistance of trial counsel."  (Order filed 8/25/03 [Doc. No. 62] at 2-6) (italics in

16   original).  As quoted above, the appellate court found that:

17       The record indicates White contacted Watson's counsel for the first time in July
         1999 and that her potential alibi testimony was thereafter made the subject of a
18       motion for a new trial.  The court denied the motion after considering the
         information and concluding it was not truly newly discovered evidence because
19       such an alibi could have been raised by Watson himself.  Contrary to Watson's
         contention, the record indicates that counsel had no knowledge of White's
20       existence or her potential testimony to present her as a witness at trial. . . .
         There is no indication in the petition, either by Watson's declaration, declaration
21       of counsel or otherwise, that counsel knew or should have known about White's
         existence or had any reason to investigate an alibi defense before trial.
22

23   (Resp.'s Lodgment C, People v. Watson, No. D034448, slip op. at 10-11.)

24       Judge Benitez found that "the California courts made these two crucial findings:

25   (1) counsel had no knowledge of White's alibi story prior to Petitioner's trial; and (2) counsel

26   had no reason to investigate an alibi defense prior to Petitioner's trial."  (11/17/04 Order

27   Denying Petition at 10.)  Judge Benitez concluded those findings were unreasonable under 28

28   U.S.C. § 2244(e)(1), and therefore not entitled to deference or a presumption of correctness,

-72-                                                                01cv1780

1   because there was no affirmative evidence in the record regarding what counsel knew or should

2   have known about the alibi prior to trial.  (Id. at 11.)  He stated:

3          [T]he state courts' factual findings were unsupported by the evidence before it.
           Certainly, if Petitioner's own declaration was the only evidence supporting his
4          claim before the state courts, those courts could have properly found the self-
           serving unsupported declaration to be disingenuous, and denied relief on that
5          basis.  However, with the addition of the internally consistent declarations of
           White and Yard, there was no basis upon which to judge all of the statements to
6          be incredible, without more.  But, there was nothing more.  Because the evidence
           before the state courts tended only to proved Petitioner's claim and did nothing to
7          disprove his claim, this Court finds that the state courts' findings of fact to the
           contrary are not entitled to deference in this proceeding under § 2254(e)(1).

8

9   (Id. at 12.)

10         Petitioner contends Judge Benitez essentially found that he had satisfied the Strickland

11  deficient performance prong, and argues that the Strickland prejudice prong is easily satisfied

12  given the weakness of the state's case.  (Pet.'s Reply at 14-17.)  Thus, Petitioner recognizes,

13  correctly, that Judge Benitez' findings were focused solely on the deficient performance prong

14  and did not address the Strickland prejudice prong.

15         It is clear that Judge Benitez did not find that Petitioner had satisfied the provisions of

16  § 2254(d), but merely found that the state court findings regarding deficient performance were

17  not entitled to deference under § 2254(e)(1), and that this Court was not precluded from

18  conducting an evidentiary hearing under § 2254(e)(2).  Such findings are not sufficient to

19  provide federal habeas relief because they dealt only with the deficient performance prong of

20  Strickland, not the prejudice prong.  See Strickland. 466 U.S. at 687 (holding that in order to

21  demonstrate constitutionally ineffective assistance of counsel, Petitioner must establish both

22  deficient performance and prejudice).  In addition, an ineffective assistance of counsel claim

23  under Strickland "should be analyzed under the 'unreasonable application' prong of section

24  2254(d)."  Weighall v. Middle, 215 F.3d 1058, 1062 (9th Cir. 2000) (recognizing "rare"

25  exception to that rule only where state court applied the wrong United States Supreme Court

26  precedent and consequently reached the wrong result.)  Judge Benitez made no findings

27  regarding the prejudice prong of Strickland.  Rather, the prejudice portion of the evidentiary

28  hearing was bifurcated from the deficient performance portion and never held, as habeas relief

1   was ultimately denied based on the finding that counsel had adequately carried out his duty to

2   investigate the possible alibi defense.  (Doc. No. 93 at 25-26.)

3        Thus, to the extent Petitioner contends that Judge Benitez found he was entitled to habeas

4   relief because he had satisfied the provisions of 28 U.S.C. § 2254(d), Petitioner is mistaken.

5   Even if Judge Benitez' findings could be read as a finding that the adjudication of Petitioner's

6   ineffective assistance of counsel claim involved an unreasonable application of Strickland,

7   satisfying the conditions of 28 U.S.C. § 2254(d) is merely a condition for obtaining federal

8   habeas relief, but does not provide a basis for granting relief.  Fry v. Pliler, 551 U.S. 112, 119

9   (2007) (holding that § 2254(d) "sets forth a precondition to the grant of habeas relief . . ., not an

10  entitlement to it.")  Thus, even if Petitioner can satisfy § 2254(d), he must still establish that the

11  alleged constitutional error provides a basis for federal habeas relief.  That is, he must not only

12  demonstrate deficient performance, but must show a reasonable probability that the result of the

13  proceeding would have been different absent trial counsel's error.  See Strickland, 466 U.S. at

14  689.  Even if Judge Benitez' findings can be read as holding that the state court adjudication of

15  involved an unreasonable application of Strickland's performance prong, the state court made

16  no findings regarding prejudice, and habeas relief is not available unless Petitioner can show

17  prejudice.  See Avila v. Galaza, 297 F.3d 911, 921 (9th Cir. 2002) (conducting an independent

18  review of the record with respect to the Strickland prejudice prong, which was not addressed by

19  the state courts, after concluding that the state court's findings regarding the performance prong

20  were objectively unreasonable).)  As set forth below, Petitioner has not satisfied § 2254(d)

21  because an independent review of the state court record demonstrates that the state court

22  adjudication of his claim did not involve an unreasonable application of Strickland.

23       Accordingly, the Court rejects Petitioner's contention that the law of the case doctrine

24  requires issuance of the writ based on Judge Benitez' previous findings.  The Court will now

25  examine the effect of Pinholster on the Ninth Circuit's remand instructions, and the effect of

26  Pinholster and Richter on the sole remaining claim in this action alleging ineffective assistance

27  of trial counsel based on allegations that counsel failed to investigate and interview potential

28  alibi witnesses White, Yard, Morgan, Douglas and Larose.

**B.     Pinholster and Richter**

The Court in Pinholster stated that federal habeas review under 28 U.S.C. § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." Pinholster, 131 S.Ct. at 1398.  Unless Petitioner can demonstrate that he has satisfied § 2254(d), the intervening Pinholster decision precludes the Court from further development of the record irregardless of the Ninth Circuit's instructions on remand.  See e.g. Stanley v. Ryan, 2011 WL 3809928 at *2 (D. Ariz. Aug. 26, 2011) (holding that because petitioner had not satisfied § 2254(d), the intervening Pinholster decision abrogated the need for an evidentiary hearing as ordered on remand by the Ninth Circuit despite the Ninth Circuit's findings that petitioner had stated a colorable claim and had not failed to develop the factual basis for the claim in the state court), citing Miller v. Gammie, 335 F.3d 889, 900 (9th Cir. 2003) (en banc) ("[W]here intervening Supreme Court authority is clearly irreconcilable with our prior circuit authority. . . . district courts should consider themselves bound by the intervening higher authority and reject the prior opinion of this court as having been effectively overruled.")

If Petitioner can satisfy the provisions of § 2254(d) by showing that, based on the state court record, the state court adjudication of his claim involved an objectively unreasonable application of Strickland, then Pinholster arguably would not preclude further development of the record in order to determine whether Petitioner actually received constitutionally ineffective assistance of counsel.  See Pinholster, 131 S.Ct. at 1401 ("Section 2254(e)(2) continues to have force where § 2254(d)(1) does not bar federal habeas relief."); see also Rossum v. Patrick, 659 F.3d 722, ___, 2011 WL 4069040 at *13 (9th Cir. Sep. 13, 2011) ("Pinholster did not hold that AEDPA bars a federal habeas court from *ever* holding an evidentiary hearing," but only bars development of the record where § 2254(d) bars relief) (Getner, D.J., concurring) (italics in original).  It is clear, however, that new evidence presented at an evidentiary hearing in federal court cannot be considered in assessing whether Petitioner has satisfied § 2254(d)(1).  See Pinholster, 131 S.Ct. at 1398-99.

Petitioner alleged in his original state supreme court habeas petition filed on August 21, 2001, that he received ineffective assistance of counsel due to "trial counsel's failure to

investigate potential alibi witnesses White, Morgan and Tuimalo,[14] whom would have substantiated petitioner's whereabouts from 3-14-96 thru 3-15-96, thus making it chronologically impossible to assume principal liability." (Pet.'s Ex. vol. IIB at 675.)  The claim was supported by: (1) the August 19, 1999, declaration of Paula White who, as set forth above, declared that she was with Petitioner in Lemon Grove on the night of the murder at Nishea Larose's house; (2) the November 27, 1999, unsworn affidavit of Derek D. Morgan, who stated that he had given Petitioner a ride to Lemon Grove to be with a female friend of Petitioner's that night; (3) the August 14, 2000 affidavit of Kristy Yard stating that Yard babysat for White that night, that White told her she was with Petitioner in Lemon Grove, and that Yard spoke to Petitioner on the telephone; and (4) Petitioner's July 2, 2001 declaration stating that he informed trial counsel in September 1996, and again in March 1999, of White's existence and that he was with her on the night of the murder.  (Id. at 683-85; id. vol. IIIA at 692-95.)  There was no mention of Douglas when presenting the claim to the state supreme court.  The state supreme court summarily denied relief in an order which stated: "Petitions for review DENIED.  Chin, J., was absent and did not participate."  (Id. vol. IIIA at 700.)

Petitioner previously presented the same allegations to the state appellate court in a habeas petition filed on November 2, 2000, which was supported by the same evidence except his own July 2, 2001, declaration.  (Id. vol. IIB at 581-604.)  As quoted above, the state appellate court denied relief after finding there was no indication in the record "that counsel knew or should have known about White's existence or had any reason to investigate an alibi defense before trial."  (Resp.'s Lodgment C, People v. Watson, No. D034448, slip op. at 10-11.)  Thus, the conclusion by Judge Benitez that it was objectively unreasonable for the "California courts" to find that counsel had no knowledge of White's alibi story before trial and no reason to investigate it, was clearly based on the evidence presented in the state supreme court petition, which was supported for the first and only time by Petitioner's own declaration stating that he had informed counsel about White prior to trial.

---

[14]   It is unclear why Petitioner alleged that Tuimalo would be able to substantiate his whereabouts, as her statement to the defense investigator neither confirms nor denies Petitioner was present during the crimes.  (CT at 38-41.)

In <u>Ylst v. Nunnemaker</u> the Court created the following rebuttable presumption: "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." <u>Ylst</u>, 501 U.S. at 803. The state appellate court denied Petitioner's ineffective assistance of counsel claim on the basis that the record indicated that trial counsel had no knowledge of the alibi prior to trial and no reason to investigate an alibi defense before trial. The addition of Petitioner's declaration in support of his claim to the state supreme court was the first and only evidence ever presented to the state courts in support of Petitioner's allegation that <u>trial counsel was aware</u> of the alibi prior to trial. Because Judge Benitez specifically referenced Petitioner's declaration in concluding that the state court unreasonably found that counsel had no knowledge of White's alibi story and no reason to investigate an alibi defense, that conclusion was obviously based on the evidence presented to the state supreme court. (<u>See</u> Order filed 8/25/03 [Doc. No. 62] at 5; 11/17/04 Order Denying Petition at 7-10.)

Accordingly, there is evidence in the record to rebut the presumption that the state supreme court's silent denial of the claim was based on the reasoning provided by the state appellate court in denying the claim. As in <u>Pinholster</u>, which also involved a summary denial by the California Supreme Court, the proper standard of review of the alibi aspect of Petitioner's ineffective assistance of counsel claim is an independent review of the record in order to determine whether the state supreme court's summary denial involved an unreasonable application of <u>Strickland</u>. See <u>Pinholster</u>, 131 S.Ct. 1402-03 ("Pinholster must demonstrate that it was necessarily unreasonable for the California Supreme Court to conclude: (1) that he had not overcome the strong presumption of competence; and (2) that he had failed to undermine confidence in the jury's [verdict]."): <u>see also</u> <u>Pirtle v. Morgan</u>, 313 F.3d 1160, 1167 (9th Cir. 2002) (holding that when the state court reaches the merits of a claim but provides no reasoning to support its conclusion, "although we independently review the record, we still defer to the state court's ultimate decision."); <u>Greene v. Lambert</u>, 288 F.3d 1081, 1089 (9th Cir. 2002) ("(W)hile we are not required to defer to a state court's decision when that court gives us nothing to defer to, we must still focus primarily on Supreme Court cases in deciding whether the state

1    court's resolution of the case constituted an unreasonable application of clearly established

2    federal law."); Weighall, 215 F.3d at 1062 (holding that an ineffective assistance of counsel

3    claim under Strickland "should be analyzed under the 'unreasonable application' prong of

4    section 2254(d).")   The Court will therefore conduct an independent review of the record in

5    order to determine whether the state supreme court's silent denial of Petitioner's ineffective

6    assistance claim involved an unreasonable application of Strickland.[15]

7         When conducting an independent review of a silent denial of a claim by the California

8    Supreme Court, a federal habeas petitioner "can satisfy the 'unreasonable application' prong of

9    § 2254(d)(1) only by showing that 'there was no reasonable basis' for the California Supreme

10   Court's decision." Pinholster, 131 S.Ct. at 1402, quoting Richter, 131 S.Ct. at 784.  "Under

11   § 2254(d), a habeas court must determine what arguments or theories . . . could have supported

12   the state court's decision; and then it must ask whether it is possible fairminded jurists could

13   disagree that those arguments or theories are inconsistent with the holding in a prior decision of

14   this Court." Richter, 131 S.Ct. at 786.  United States Supreme Court authority is clear that the

15   state supreme court's silent denial here was an adjudication on the merits of Petitioner's claim.

16   See Pinholster, 131 S.Ct. at 1402 ("Section 2254(d) applies even where there has been a

17   summary denial."), citing Richter, 131 S.Ct. at 786.

18        With respect to the performance prong, the state supreme court could have found that trial

19   counsel was not deficient in failing to present an alibi defense because none of the alibi

20   witnesses were willing to come forward at trial.  Such a conclusion is supported by the fact that

21

22   [15] Although Judge Benitez indicated in his November 17, 2004 order denying habeas relief that
he would apply § 2254(d) to the appellate court's reasoning with respect to the ineffective assistance
23   of counsel claim (Doc. No. 93 at 3-4), it does not appear that he did so, as he relied exclusively on the
evidence presented at the federal evidentiary hearing and the credibility findings drawn therefrom to
24   deny relief on the basis that Petitioner's trial counsel did not fail in his duty to investigate the alibi
defense.  (Id. at 23-26.)  In any case, because that claim was denied based on the evidence adduced at
25   the evidentiary hearing, Pinholster requires this Court to reconsider that denial, and upon reconsideration
the Court must apply the correct standard of review to the state court adjudication.  Moreover, even were
26   the Court to look through to the appellate court opinion, that opinion did not address the prejudice
prong, but focused entirely on Petitioner's failure to satisfy the performance prong, and the Court would
27   still need to conduct an independent review of the record as to the prejudice prong for the reasons set
forth by the Ninth Circuit in this case.  (See Doc. No. 109 at 6 n.4 and 7 n.5) (noting that an independent
28   review of the record is necessary with respect to the Strickland prejudice prong when, as here, the
appellate court addressed only the performance prong.)

-78-

Petitioner twice complained to the trial judge regarding what he perceived as unfairness in his trial, but did not mention the failure to put on an alibi defense or complain that his counsel was unable to find or produce the alibi witnesses. In fact, Petitioner did not present evidence to the state courts supporting his allegation that he told counsel prior to trial that he was with White at the time of the murder until the very end of his direct appeal process. Such a finding does not necessarily conflict with the findings of Judge Benitez because Judge Benitez did not have the benefit of <u>Pinholster</u> or <u>Richter</u> which require a more exacting, imaginative and probing review of the state court order.

Nevertheless, the state appellate court found that the record did not support a finding that trial counsel knew about the alibi prior to trial, and trial counsel presented the alibi in the new trial motion as "newly discovered" evidence. It now appears, however, based on the expansion of the record in this Court, that trial counsel knew something about the alibi witnesses prior to trial. Yet, for two reasons, this Court is not faced with the dilemma of upholding a finding by the state court which has been proven erroneous by evidence which this Court is not permitted to consider. First, the state court did not find that trial counsel was unaware of the alibi prior to trial. Rather, the appellate court found that the record did not establish that counsel was aware of the alibi prior to trial. Judge Benitez concluded that an evidentiary hearing was not precluded and was necessary because such a finding was unreasonable, and the federal evidentiary hearing developed the record in order to determine whether counsel knew of the alibi defense before trial. The evidentiary hearing did not, nor was it designed to, determine whether the state court was correct or incorrect in reaching its conclusion that there was insufficient evidence in the state court record to establish that trial counsel knew of the alibi prior to trial.

Secondly, even if Judge Benitez' original findings bind this Court with a conclusion that counsel's performance was deficient, or that the state court adjudication of the claim involved an unreasonable application of the <u>Strickland</u> performance prong, the state court did not make any findings regarding the prejudice prong. The Ninth Circuit has indicated that this Court must still conduct an independent review of the record with respect to the <u>Strickland</u> prejudice prong even if the state court's determination regarding performance was unreasonable. (<u>See</u> Doc. No.

109 at 6 n.4, citing <u>Avila</u>, 297 F.3d at 921 (conducting independent review of the record with respect to the <u>Strickland</u> prejudice prong, which was not addressed by the state courts, after finding that the state court's findings regarding the performance prong were objectively unreasonable).)  Judge Benitez made no findings regarding prejudice.  Rather, the final order denying habeas relief on the alibi aspect of the ineffective assistance claim was based exclusively on the finding that trial counsel was not deficient in his duty to investigate the alibi defense.  (<u>See</u> Doc. No. 93 at 23-26.)  Thus, the Court will conduct an independent review of the record in order to "determine what arguments or theories . . . could have supported the state court's decision" with respect to the prejudice prong of <u>Strickland</u>, and then "ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with" <u>Strickland</u>'s prejudice prong.  <u>Richter</u>, 131 S.Ct. at 786.

Although Petitioner argues that the evidence against him was weak, an independent review of the record reveals that it was not so weak as to demonstrate "a probability sufficient to undermine confidence in the outcome" of the trial but for the failure to introduce his alibi defense.  <u>Strickland</u>, 466 U.S. at 694; <u>Luna</u>, 306 F.3d at 966 (requiring the prejudice inquiry to be considered in light of the strength of the prosecution's case).  There were six eyewitnesses present during the robbery, kidnap and assault of Williams: Haley, Harriel, Davis, Tei, Tuimalo and Williams.  Tei and Davis testified at trial and provided direct eyewitness testimony against Petitioner.  Haley, Harriel and Tuimalo all refused to testify.  However, they all pled guilty to robbing Williams, providing further support for Petitioner's conviction on the charges arising from the events at the Seven Gables motel.  Petitioner contends that all five persons may have pled guilty to robbery in order to avoid being convicted of murder or as accomplices to the murder which took place after they left the Seven Gables motel.  Although that argument may slightly lessen the corroborative effect their convictions provide, it does not eviscerate such effect.  Moreover, Tei and Davis both testified at trial that they were present when Petitioner murdered Atkins, and Davis testified that she watched Petitioner kill Atkins in cold blood.  Tei and Davis also testified that Petitioner espoused a motive for the murder.  Additionally, a newspaper article about the murder which included a photograph of the crime scene was found

1   under Petitioner's mattress.  Thus, there was strong direct eyewitness testimony at trial from

2   persons who knew Petitioner as well as corroborative circumstantial evidence.

3          Petitioner's alibi, however, is, was, and remains weak.  The state court was presented with

4   evidence that White, a former girlfriend, provided an alibi so weak that Petitioner did not object

5   when it was not presented at trial, despite objecting immediately after the verdict that the trial

6   judge had failed to disclose that he knew a juror, and despite reading a prepared statement seven

7   weeks later at the time originally set for sentencing in which he said he was deeply disturbed

8   about the outcome of the trial because the prosecution had relied on a false motive for the killing.

9   It is certainly reasonable for the state court to expect a factually innocent person to focus on his

10   counsel's failure to investigate and present his alibi, rather than on perceived procedural

11   irregularities in the trial.  This is particularly true where, as here, Petitioner personally knew all

12   five of his alibi witnesses, and there were additional potential alibi witnesses among the guests

13   at the party he allegedly attended.

14          Even setting aside the weakness implicit in Petitioner's failure to complain to the trial

15   court that an alibi defense had not been presented, and setting aside the fact that White is the

16   mother of Petitioner's child and Petitioner had not seen or heard from White for several years

17   when she supposedly contacted him that very night, the alibi provided by White was only ever

18   really corroborated by Petitioner.  Yard merely stated that White told her over the telephone that

19   White was with Petitioner.  Although Yard said she spoke to Petitioner on the telephone, Yard

20   could not testify as an eyewitness to Petitioner's location at that time.  The real corroborating

21   witnesses, Morgan, who supposedly drove Petitioner to San Diego that night, Douglas, whom

22   they allegedly visited on the way, and Larose, who hosted the party Petitioner supposedly

23   attended and at whose home Petitioner and White allegedly spent the night, have never provided

24   sworn testimony in any court.  The state supreme court could certainly have considered the fact

25   that although these individuals are Petitioner's friends, he was unable to secure sworn testimony

26   from any one of them prior to trial or arrange for any one of them to appear at his trial, during

27   the thirteen and one-half months he was incarcerated after the charges were initially filed, during

28   the ten months he was not in custody after the charges were dismissed due to the inability of the

1  prosecution to locate Davis, and during the seven months he was awaiting trial after the charges

2  were refiled, results hardly conducive to a finding of a strong alibi.[16]

3       Furthermore, even if Petitioner's friends were unavailable to testify at trial, or could not

4  be located for some  reason, including a deficient investigation by trial counsel, Petitioner could

5  have informed the trial court of their existence and the relevance of their testimony, and could

6  have complained of counsel's failure to locate them or sought a continuance based on their

7  unavailability, but he did not raise the issue until well after he was convicted and well after he

8  had prepared and read a statement complaining of the defects of the trial.  The state supreme

9  court could have reasonably concluded that Petitioner did not insist on presenting an alibi

10  defense because he or his counsel were concerned that the alibi witnesses would harm the

11  defense by presenting (as it turned out at the evidentiary hearing here) unbelievable testimony.

12  It would also be reasonable for the state court to conclude that even if Petitioner told his trial

13  counsel about the alibi when preparing for trial, the failure of any one of Petitioner's five friends

14  who knew he was not in Oceanside that night to come forward on his behalf despite his spending

15  nearly two years incarcerated with the charges pending against him, supported a finding that

16  counsel was not deficient in investigating the alibi, or that the alibi was unreliable or even false.

17  Obviously, in hindsight, based on development of the record in this Court, the state court's

18

19       [16] Petitioner's federal habeas counsel indicated that he had located Larose in January 2004, and
20  that she had "made statements to us affirming, although somewhat loosely – because it's been seven
   years – the gist of what Ms. White has put in her declaration." (1/9/04 Pre-Evidentiary Hearing Tr. at
21  6-7.) Habeas counsel indicated that when he contacted White she was unwilling to provide her address
   and he had to track her down through caller I.D., and counsel requested time to subpoena her to attend
22  the evidentiary hearing before the government contacted her "in case she decides to disappear." (Id. at
   40.)  Petitioner presented a declaration from Bobbie Douglas signed on April 20, 2004, stating that
23  Petitioner came to see her "on a night in mid-March 1996, but I cannot recall the exact date," and that
   he stayed a short time before leaving for a party. (Doc. No. 84, Ex. K.)  Petitioner has apparently never
24  secured a properly sworn statement from Morgan, although he contends Respondent has never
   challenged the authenticity of Morgan's original statement.  In any case, Petitioner had three years from
25  April 1996 when he was first arrested and notified he was a suspect in the murder, until the April 1999
   verdict to arrange for his friends to testify at his trial or come forward with evidence in his favor, but
26  did not do so.  And although Petitioner's post-trial failure to secure sworn testimony from Morgan and
   Larose may be excusable, and although he presents a declaration from an experienced trial attorney
27  warning of the danger of allowing a defendant to contact witnesses due to the possibility of witness
   tampering allegations, etc. (see id. at Ex. H), the state court's decision could still reasonably be informed
28  by Petitioner's failure to notify the trial court that his trial counsel was unable to locate the witnesses
   or to secure their testimony.

1    rejection of the alibi claim was objectively reasonable for the reasons given by this Court, that

2    there was no credible alibi.  (See 11/17/04 Order Denying Petition at 25.)  However, considering

3    just the evidence presented to the state supreme court, it is clear that the state supreme court

4    could have found that in light of the strong eyewitness evidence and corroborative circumstantial

5    evidence introduced at trial, there was no reasonable probability that confidence in the outcome

6    of the trial was undermined by the failure to present an alibi so weak that none of the numerous

7    potential alibi witnesses came forward before trial and Petitioner did not object to its absence

8    while objecting to other perceived trial deficiencies.

9         Based on the state court record, this Court cannot say that the state supreme court's ruling

10   "was so lacking in justification that there was an error well understood and comprehended in

11   existing law beyond any possibility for fairminded disagreement."  Richter, 131 S.Ct. at 786-87.

12   This is an extremely high hurdle to clear.  The Supreme Court has stated that "[i]f this standard

13   is difficult to meet, that is because it was meant to be . . . [as it] guard[s] against extreme

14   malfunctions in the state criminal justice systems [and] preserves authority to issue the writ in

15   cases where there is no possibility fairminded jurists could disagree that the state court decision

16   conflicts with this Court's precedents."  Id. at 786.  Accordingly, considering only the evidence

17   presented in the state courts, the Court finds that Petitioner has not satisfied § 2254(d)(1) and is

18   not entitled to relief with respect to the alibi aspect of his ineffective assistance of counsel claim.

19   Because Judge Benitez did not have the benefit of the intervening controlling authority of

20   Pinholster and Richter, the Court is required to reexamine the previous denial of habeas relief.

21   Gammie, 335 F.3d at 900; In re Rainbow Magazine, 77 F.3d at 281.  Upon reexamination, the

22   Court denies habeas relief on the basis that an independent review of the state court record

23   requires a conclusion that the state supreme court's silent denial of the claim that Petitioner

24   received constitutionally ineffective assistance of trial counsel with respect to potential alibi

25   witnesses White, Yard and Morgan, did not involve an unreasonable application of Strickland.

26        Moreover, even assuming that Judge Benitez's finding that Petitioner stated a *prima facie*

27   case of ineffective assistance of counsel in the state court constitutes evidence that fairminded

28   jurists might disagree whether the state court was correct in denying habeas relief, see e.g.

1  Pinholster, 131 S.Ct. at 1402 n.12, or that this Court is required to look through to the appellate

2  court opinion and would find it to involve an unreasonable application of Strickland on the basis

3  of flawed deficient performance findings so severe as to satisfy § 2254(d), or assuming that

4  Petitioner could satisfy the conditions of § 2254(d) on any basis whatsoever, the result with

5  respect to White, Yard and Morgan would be the same.  If Petitioner could somehow satisfy the

6  requirements of § 2254(d) and thereby avoid the limitation on development of the record under

7  Pinholster, the Court would deny habeas relief as to this claim for the same reasons Judge

8  Benitez denied relief and the Ninth Circuit affirmed, that is, because the evidence presented at

9  the evidentiary hearing supports a finding that trial counsel fulfilled his duty to investigate

10  White, Yard and Morgan, and that they did not provide a credible alibi.  The Court would make

11  the same finding even if it were to consider Petitioner's procedurally defaulted allegations that

12  trial counsel lied at the evidentiary hearing regarding what counsel knew about White and when,

13  and regarding when Petitioner told him about the alibi.  This is because those allegations are

14  rebutted by Judge Benitez' credibility findings, which were in turn accepted by the Ninth

15  Circuit.  Accordingly, the Court finds that Petitioner has not established entitlement to habeas

16  relief based on his claim that trial counsel rendered ineffective assistance for failing to interview

17  potential alibi witnesses White, Yard and Morgan, irrespective of whether Pinholster requires

18  the Court to reconsider the previous denial of that aspect of his claim.

19          The final issue to address is the Ninth Circuit's remand instructions regarding Douglas

20  and Larose.  The Ninth Circuit reversed this Court's denial of habeas relief as to Douglas on the

21  basis that "the record is devoid of any explanation whatsoever" as to why counsel did not follow

22  up when his investigator told him he could not find a Mr. Douglas when counsel knew that

23  Douglas was a female.  (Doc. No. 109 at 3.)  The Ninth Circuit remanded with instructions  to

24  further develop the record regarding counsel's reasons for failing to follow up with Douglas.

25  (Id. at 4.)  The Ninth Circuit also found that this Court did not make any specific findings

26  regarding the reasonableness of counsel's failure to interview Larose, and stated that "On

27  remand, the district court should address this issue as well."  (Id.) As set forth above, according

28  to Petitioner, he and Morgan stopped at Douglas' house for about an hour on their way to the

party at Larose's house on the night of the murder.  Although White's declaration mentions Larose, there was never any mention of Douglas in the original state court proceedings, even in the declaration provided by Petitioner or the improperly sworn affidavit provided by Morgan. (Pet.'s Ex. vol. IIB at 669-89; id. vol. IIIA at 690-95.)

Petitioner is very insistent that when he returned to state court to exhaust his new allegations of deficient performance, he purposely and intentionally omitted the alibi claim or any claim relying on the new or old alibi witnesses.  (Pet.'s Reply at 4-5.)  He contends that Respondent is wrong to assert that the Douglas and Larose aspect of the claim was presented in his 2007 state exhaustion petition.  (Id. at 4.)  A review of that petition supports Petitioner's contention that such a claim was not presented.  (See Pet.'s Ex. vol. V. at 1960-2093.) Nevertheless, in the state exhaustion petition, in support of the cumulative ineffective assistance claim, Petitioner alleged that his trial counsel had lied at the evidentiary hearing regarding Douglas and Larose:

> During the federal proceedings, the district judge submitted interrogatories to [trial counsel] asking what he knew about an alibi before trial. [He] responded in two different pleadings, filed one year apart, and gave widely divergent answers. (See DSP at 837-39, 025-26.)  In those answers, [trial counsel] never identified alibi witnesses Bobbie Douglas and Nishea Larose. At the evidentiary hearing, he was forced to admit, based on his own file records and notes, that he knew about these two alibi witnesses, yet did nothing to follow up on them. (See DSP at 1138, 1153-54, 1226, 1367.)  (This is the basis of the Ninth Circuit reversal, and the on-going proceedings in federal District Court.)

(Pet.'s Ex. vol. V. at 2018-19.)

Petitioner contends it is obvious that the Ninth Circuit considered the Douglas and Larose aspect of the ineffective assistance claim to be exhausted because it remanded with respect to those witnesses but dismissed the appeal as to the unexhausted claims. (Pet.'s Reply at 4.)  If Petitioner is correct that the addition of potential alibi witnesses Douglas and Larose, who could merely corroborate the alibi provided by White, Yard and Morgan, does not place the claim in a significantly different or stronger evidentiary posture or fundamentally alter its nature, then he has not satisfied the conditions of § 2254(d)(1) for the same reasons set forth above as to why he has not satisfied § 2254(d)(1) regarding White, Yard and Morgan.  Even if the new allegations fundamentally alter the claim, relief is not available because the Court has already

found that the state court's adjudication of the claim relying on White, Yard and Morgan did not

involve an objectively unreasonable application of Strickland.  See Pinholster, 131 S.Ct. at 1402

n.11 (finding that even if new evidence presented in federal court "fundamentally changed

Pinholster's claim so as to render it effectively unadjudicated," his failure "to show that the

California Supreme Court unreasonably applied clearly established law on the record before that

court . . . brings our analysis to an end.")  In any case, as set forth above, neither this Court, the

Ninth Circuit, nor Petitioner find it plausible that allegations regarding Douglas and Larose

fundamentally altered the claim so as to render it effectively unadjudicated.[17]

To the extent the allegations in the exhaustion petition that trial counsel lied at the

evidentiary hearing regarding what he knew about Douglas and Larose could be read as

exhausting a claim that trial counsel rendered ineffective assistance by failing to investigate and

interview Douglas and Larose, such a claim, as quoted above, is supported by evidence

developed at the evidentiary hearing in this Court.  (Pet.'s Ex. vol. V. at 2018-19.)  As set forth

above in the procedural default section of this Order, the state supreme court denied the petition

containing that claim on procedural grounds.  Because the claim was never adjudicated on its

merits in the state court, to the extent the Court could reach the merits, § 2254(d) does not apply,

and the Pinholster restriction on further evidentiary development also does not apply.  See

Pinholster, 131 S.Ct. at 1401 ("Section 2254(e)(2) continues to have force where § 2254(d)(1)

does not bar federal habeas relief."); James v. Schriro, 659 F.3d 855, 867 (2011) (holding that

Pinholster does not apply to claims which were not adjudicated on their merits in state court).

Thus, if Petitioner first exhausted the Douglas and Larose aspect of the ineffective assistance of

---

[17]  If Petitioner could show that the addition of allegations regarding Douglas and Larose presents a claim which has never been presented to the state courts, he would meet the technical requirement for exhaustion because he no longer has state court remedies available to him for the reasons discussed above.  See Cassett, 406 F.3d at 621 n.5 ("A habeas petitioner who has defaulted his federal claims in state court meets the *technical* requirements for exhaustion; there are no state remedies any longer 'available' to him."), quoting Coleman, 501 U.S. at 732.  The claim would then be procedurally defaulted.  Coleman, 501 U.S. at 735 n.1 (holding that a procedural default arises when a petitioner has "failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.")  Petitioner could not overcome a procedural default as to Douglas and Larose for the reasons set forth above regarding why he is unable to overcome the procedural default arising from the state timeliness bar already imposed as to his other new allegations of deficient performance.

counsel claim in the state exhaustion petition (a proposition Petitioner sternly denies), and if this Court could reach the merits of that claim (which it cannot because it is procedurally defaulted), Pinholster would not preclude development of the record consistent with the Ninth Circuit's remand order.

The Court cannot reach the merits of such a claim, however, because it would be procedurally defaulted for the reasons set forth above in the procedural default section of this Order finding that the other newly exhausted claims which were denied in the same state court order are procedurally defaulted. Petitioner cannot establish cause to excuse the default for the reasons set forth above. He cannot establish prejudice to excuse the default because Douglas and Larose could, at best, merely corroborate the alibi provided by White, Yard and Morgan, and for the reasons set forth above Petitioner cannot establish constitutionally ineffective assistance of counsel based on counsel's failure to present the alibi.

## C.  Conclusion

The Court rejects Petitioner's contention that Judge Benitez made findings prior to the evidentiary hearing which require granting federal habeas relief. The Court finds, based on the intervening controlling authority exception to the law of the case doctrine, that Pinholster precludes this Court from conducting another evidentiary hearing in this matter, irrespective of the Ninth Circuit's instructions on remand, and requires reexamination of the previous denial of habeas relief as to the alibi aspect of Petitioner's ineffective assistance of trial counsel claim. Upon reconsideration under Pinholster and Richter of Petitioner's claim that his trial counsel rendered constitutionally ineffective assistance in failing to investigate and interview potential alibi witnesses, the Court finds Petitioner is not entitled to habeas relief because he has failed to demonstrate that the adjudication of that claim by the state court involved an unreasonable application of clearly established federal law.

## VII.   CONCLUSION AND ORDER

For the foregoing reasons:

(1) Petitioner's request to amend the Petition is **GRANTED** in part and **DENIED** in part. The Petition for a writ of habeas corpus was constructively amended to include the new Brady

claim and the new allegations of deficient performance of trial counsel as of January 28, 2008;

(2)  The new Brady claim and the new allegations of deficient performance of counsel, other than allegations that trial counsel provided deficient performance with respect to the alibi witnesses, are barred by the one-year statute of limitations;

(3)  The new Brady claim and the new allegations of deficient performance of counsel are procedurally defaulted;

(4)  To the extent the Court could reach the merits of the procedurally defaulted claims, the Court finds that the claims are without merit and do not provide a basis for federal habeas relief either individually or cumulatively;

(5)  The previous denial of the claims in the Petition and Traverse, which was based solely on the state court record, with the exception of the ineffective assistance of counsel claim based on the failure of trial counsel to investigate and interview potential alibi witnesses, is not reexamined and remains undisturbed as affirmed by the Ninth Circuit;

(6)  The controlling intervening authority of Cullen v. Pinholster, 563 U.S. ___, 131 S.Ct. 1388 (2011), prevents this Court from conducting another evidentiary hearing or further development of the record with respect to Petitioner's allegations that his trial counsel failed to investigate and interview potential alibi witnesses Douglas and Larose, irrespective of the instructions on remand from the Ninth Circuit, and prevents the Court from considering the evidence presented at the evidentiary hearing or relying upon the credibility determinations drawn therefrom in addressing any claim in the Petition;

(7)  After reconsideration necessitated by Pinholster and Harrington v. Richter, 562 U.S. ___, 131 S.Ct. 770, 788 (2011) of the sole remaining claim in the Petition alleging ineffective assistance of counsel based on trial counsel's failure to interview and investigate potential alibi witnesses, habeas relief is **DENIED** because, based on an independent review of the state court record, the adjudication of that claim by the state court did not involve an unreasonable application of clearly established federal law;

(8)  The Petition for a writ of habeas corpus is **DENIED**; and,

//

-88-

01cv1780

1   //

2   //

3   //

4   //

5        (9)  The Court **ISSUES** a Certificate of Appealability as to all claims and issues raised

6   and encompassed in this action.

7        IT IS SO ORDERED.

8   DATED:  December 6, 2011

9                     _____

10                     Hon. Anthony J. Battaglia
                      U.S. District Judge